**In re BIG RIVERS ELECTRIC CORPORATION, Debtor.**

No. 4:01–CV:49.

United States District Court,
W.D. Kentucky.
Owensboro Division.

Aug. 13, 2002.
As Corrected Aug. 19, 2002.

582

*MEMORANDUM OPINION AND OR-
DER REQUIRING DISGORGE-
MENT OF EXAMINER'S FEES
AND EXAMINER'S COUNSEL'S
FEES*

COHN, District Judge.

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.[1]

**TABLE OF CONTENTS**

I. Introduction ................................................583

II. Background ................................................584

III. Findings of Fact ............................................584
 A. Big Rivers' Bankruptcy ...............................584
 B. The Examiner's Appointment and Conduct ..............584
 1. Appointment ....................................584
 2. Seeking Compensation ..........................586
 C. Disgorgement ........................................593
 D. Proceedings in this Court .............................594

IV. Conclusions of Law ..........................................594
 A. The Parties' Arguments ...............................594

---

1. *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, J. then Chief Judge of the New York Court of Appeals, commenting on the nature of a trustee's common law obligation).

B. Standing ......................................................... 595
C. The Law ......................................................... 595
 1. Disinterested Person ......................................... 595
 2. Duty to Disclose ............................................. 597
 3. Public Policy ................................................ 599
 4. A Word About Ex Parte Communications and the Bankruptcy Court's
 So–Called Approval ........................................... 600
 5. Enhanced Compensation in General and the Examiner's Efforts in the
 Case ......................................................... 600

V. Conclusion ......................................................... 601

## I. Introduction

This is the remnants of what has been appropriately termed a "monstrosity" of a bankruptcy case. What is left is a dispute over fees paid, or to be paid, to the Examiner and the Examiner's counsel. Consistent with the history of the case, this dispute is contentious and has generated an excess of papers.

There are presently three matters before the Court. First, the Rural Utilities Service (RUS) and the United States Trustee (collectively, the government) have filed a joint motion seeking disgorgement of all of the fees paid to the Examiner in this case on the grounds that the Examiner engaged in misconduct in soliciting payments from certain unsecured creditors for his compensation as Examiner.

Second, Big Rivers Electrical Corporation (Big Rivers) has filed a motion seeking partial disgorgement of the Examiner's fees and the Examiner's counsel's fees, as follows: (1) the fees incurred in pursuing an "enhanced fee," (2) the fees incurred in pursuing/defending the Examiner's right to interim compensation, (3) the fees incurred in requesting amicus in one of the several appeals from the bankruptcy court and (4) the fees incurred in defending against the instant disgorgement motions.

Finally, the Examiner and his counsel[2] have separately filed "final fee applica-

tions." The Examiner seeks compensation for services from October 13, 1998 to May 21, 1999 in the amount of $57,337.50 and $1,520.98 in expenses. The Examiner's counsel seeks compensation for legal services from October 13, 1998 to August 18, 2000 and from October 24, 2000 to November 21, 2000 in the amount of $322,588.25 in legal fees and $4,701.27 in expenses.

For the reasons which follow, the government's motion for disgorgement is GRANTED. Big Rivers' motion for partial disgorgement is GRANTED. The Examiner must disgorge all fees paid to him. Likewise, although the government has not requested disgorgement of the Examiner's counsel's fees, and Big Rivers has only requested partial disgorgement, because the Examiner's counsel is essentially the alter ego of the Examiner, and under the circumstances, the Examiner's counsel must also disgorge all fees. As such, the Examiner and the Examiner's counsel's final fee applications are DISALLOWED.

As will be explained, the Examiner's actions, relating to his compensation were wholly incompatible with his obligations under the Bankruptcy Code and Rules; disgorgement of all fees paid to the Examiner and his counsel is the appropriate remedy for the Examiner's failure to adhere to the required standard of behavior for a professional in a bankruptcy case.

---

2. The Examiner's counsel is the law firm of Baxter J. Schilling. Thus, the Examiner employed his own law firm as his counsel. The Examiner is currently being represented by the law firm of Talbott & Talbott, PLLC on the instant motions.

## II. Background

The background of this case has been set forth in several published opinions and need not be repeated. *See In re Big Rivers Elec. Corp.*, 233 B.R. 768, 771–77 (Bankr.W.D.Ky.1999) (awarding fees to professionals); *In re Big Rivers Elec. Corp.*, 233 B.R. 754 (Bankr.W.D.Ky.1999) (awarding compensation to the Examiner, including an enhanced fee, later reversed on appeal to the district court); *In re Big Rivers Elec. Corp.*, 233 B.R. 726, 728–33 (Bankr.W.D.Ky.), aff'd 233 B.R. 739, 742–45 (W.D.Ky.1998) (denying claim filed by prospective purchaser of Big Rivers); *In re Big Rivers Elec. Corp.*, 213 B.R. 962, 964–71 (Bankr.W.D.Ky.1997) (denying motion to disqualify bankruptcy judge and remove the Examiner). The findings of fact relevant to the disgorgement issue follow.

## III. Findings of Fact

### A. Big Rivers' Bankruptcy

On September 26, 1996, Big Rivers filed for Chapter 11 bankruptcy protection with approximately $1.2 billion in debt. At the time, its principal creditors consisted of the RUS of the United States Department of Agriculture, to whom Big Rivers owed more than $1.1 billion, secured by a mortgage on all of its assets, which resulted from low interest loans RUS had made or guaranteed to finance Big Rivers' generation and transmission facilities, buildings, plant, and equipment. It also owed unsecured amounts to the Bank of New York (BONY), Chase Manhattan Bank (Chase) and Mapco Equities (Mapco). BONY and Chase's unsecured claims arose from letters of credit issued by them securing unsecured pollution control bonds issued by Big Rivers. Mapco's unsecured claim of approximately $18.5 million was owed on a coal contract. BONY, Chase, and Mapco disputed the RUS's claim of a right of priority.

Big Rivers' filing represented the largest bankruptcy in Kentucky and one of the largest in the country at the time.

### B. The Examiner's Appointment and Conduct

#### 1. Appointment

On October 7, 1996, Bluegrass Containment, Inc., an unsecured creditor, filed a Motion To Appoint Trustee Or Examiner. Mapco, Chase and BONY filed motions for the appointment of a Trustee.

The appointment of an Examiner is governed by 11 U.S.C. § 1104(b) which states:

> [A]t any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, **the court shall order the appointment of an examiner** to conduct an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity . . .
>
> if—
>
> (1) such appointment is in the interests of creditors . . . ; or
>
> (2) the debtor's fixed, liquidated, unsecured debts . . . exceed $5,000,000.

11 U.S.C. § 1104(b) (emphasis added).

In this circuit, section 1104(b) is strictly interpreted: "The provision plainly means that the bankruptcy court 'shall' order the appointment of an examiner when the total fixed, liquidated, unsecured debt exceeds $5 million," if a party or the U.S. Trustee requests one. *In re Revco D.S., Inc.*, 898 F.2d 498, 501 (6th Cir.1990).

On October 16, 1996, the bankruptcy court granted Bluegrass Containment, Inc.'s motion and directed the appointment of an Examiner. The bankruptcy court also stated that in addition to the duties

under 11 U.S.C. § 1106(b),[3] the Examiner shall:

1) Investigate all allegations set forth in the BC Motion, the Chase/BYN Motion, and Mapco Motion (collectively, "Trustee Motions") concerning the alleged mismanagement and/or breaches of fiduciary duty by Big Rivers.

2) Prepare a Report, to be filed under seal with this Court, concerning the validity of the allegations set forth in the Trustee Motions.

3) Work with Big Rivers and its creditors in (a) facilitating discovery concerning the Trustee Motions; (b) resolving various disputes with creditors, including Green River Coal Co., Inc. ("Green River") and (c) if feasible, "attempt to negotiate a global settlement of the disputes in this case and the development of a consensual plan of reorganization."

The bankruptcy court directed the U.S. Trustee to select an examiner. On October 18, 1996, upon application of the U.S. Trustee, the bankruptcy court issued an Order Approving Appointment of Examiner, appointing J. Baxter Schilling as Examiner.[4] Neither the October 16 or 18, 1996 orders state how the Examiner is to be compensated for his services.

At the time of his selection, the Examiner submitted an Affidavit of Examiner that He is Disinterested, stating in part that he "is a disinterested person in this case; that [he] is not a creditor.... [and] does not

---

3. 11 U.S.C. § 1106 provides:
 § 1106. Duties of trustee and examiner
 (a) A trustee shall—
 (1) perform the duties of a trustee specified in sections 704(2), 704(5), 704(7), 704(8), and 704(9) of this title;
 (2) if the debtor has not done so, file the list, schedule, and statement required under section 521(1) of this title;
 (3) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan;
 (4) as soon as practicable—
 (A) file a statement of any investigation conducted under paragraph (3) of this subsection, including any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate; and
 (B) transmit a copy or a summary of any such statement to any creditors' committee or equity security holders' committee, to any indenture trustee, and to such other entity as the court designates;
 (5) as soon as practicable, file a plan under section 1121 of this title, file a report of why the trustee will not file a plan, or

recommend conversion of the case to a case under chapter 7, 12, or 13 of this title or dismissal of the case;
 (6) for any year for which the debtor has not filed a tax return required by law, furnish, without personal liability, such information as may be required by the governmental unit with which such tax return was to be filed, in light of the condition of the debtor's books and records and the availability of such information; and
 (7) after confirmation of a plan, file such reports as are necessary or as the court orders.
 (b) An examiner appointed under section 1104(d) of this title shall perform the duties specified in paragraphs (3) and (4) of subsection (a) of this section, and, except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform.

4. Schilling is a 1972 graduate of the University of Kentucky and a 1975 graduate of the University of Virginia Law School. He has a substantial bankruptcy practice, devoting well over the majority of his time to bankruptcy. He lectures on bankruptcy topics before bar associations and business groups. He has served as a bankruptcy panel Chapter 7 trustee in the Western District of Kentucky since 1979.

have an interest materially adverse to the interest of the estate or of any class of creditors." *See* Exhibit A. He also filed a Verified Statement of Appointee—Examiner, stating that he has "no connections with the ... Debtor, creditors, or any other interested parties." *See* Exhibit B.

### 2. Seeking compensation [5]

Within two weeks after his appointment, the Examiner conducted meetings with the RUS and representatives from BONY, Chase and Mapco on October 31, 1996 and November 1, 1996 in Washington, D.C. The Examiner stated his intent to act as a mediator at these meetings in an attempt to resolve the dispute between the RUS and the banks as to priority. The statements by the Examiner at these meetings form the primary basis for the government's motion.

At the meeting, the Examiner told representatives of Chase and BONY, that he wanted to be paid a percentage fee of 3% as if he were a trustee.[6] The Examiner also stated that his percentage fee would be based on the "success" that he believed he could bring to Big Rivers' estate in the form of "new value," or increased cash. The Examiner then told Chase, BONY, and Mapco that he would seek to have them pay his fee, based on the "new value" he added to their claims against Big Rivers. In other words, each of these unsecured creditors was to pay the Examiner 3% of the amount that they received from Big Rivers. The Examiner and these unsecured creditors understood that any fee arrangement was subject to the approval of the bankruptcy court.

Representatives from RUS were not present in the room during the Examiner's fee discussions.

The Examiner also told Jeffrey Tanenbaum, attorney for BONY, that he was not going to pursue and perform his mediation duties, unless it was clear that he was going to be getting the percentage fee, and he would abort the negotiation unless he was comfortable or had an understanding that he would be able to receive a trustee's fee. The Examiner denies having made such a statement.

The Examiner understood by the end of the meeting that BONY, Chase and Mapco had agreed to his 3% fee approach. The Examiner was wrong in this belief.

Later in November 1996, The Examiner called Pat Daniello of Chase and also Mark Thompson, counsel for Chase, because he was upset that he had heard Chase was not supporting his being compensated with a success fee. He accused Chase of going behind his back and not being an honest dealer.

Asking The Examiner "to keep this confidential," Thompson then wrote the Examiner a confirming letter to assure him that suggestions that Chase opposed his

---

5. The following facts were developed during discovery on the issue of the Examiner's compensation. As mentioned *infra,* no discovery surrounding the Examiner's compensation was allowed until the Court was assigned this case.

6. The court may award trustees, like other professionals, "reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person or attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title." 11 U.S.C. § 330(a)(1). Congress further defined compensation for trustees by limiting the amount a court may award a trustee for his or her services under § 330(a)(1) to a percentage based upon the amount of moneys disbursed or turned over in a specific case. Under 11 U.S.C. § 326(a), a trustee is limited to 3% if such moneys are in excess of $1,000,000.00.

requesting 3% of enhanced value were "incorrect."

Thompson's letter also related that Assistant U.S. Trustee Joe Golden had told him that he had heard the Examiner "had requested a fee of '3% of enhanced value'. The tenor of Joe's question remarks led me to think he found this fee inappropriate." In the letter, Thompson related that he told Golden "I did not recall any such request from you." Nevertheless, Thompson testified that: "I didn't say to Mr. Golden I didn't recall any such request."

The Examiner kept Thompson's letter confidential.

Prior to a November 13, 1996 hearing on several matters, including the compensation of other professionals in the case, "one or more interested persons," which included the RUS, spoke to a member of the bankruptcy court's staff and requested an *in camera* hearing regarding "concerns about the Examiner's statements that he would seek compensation based upon the additional value a settlement of the case would bring to the bankruptcy estate." The bankruptcy court instructed his staff member to inform the parties that they could raise this issue at the hearing and that there would not be an *in camera* hearing.[7] No party, however, objected to the Examiner's compensation at the November 13, 1996 hearing.

█ On November 15, 1996, the bankruptcy court entered an order establishing the procedure for compensating the Examiner and his professionals (his counsel) in the interim. The procedure required the Examiner to submit monthly bills to Big

Rivers, who had time to object or pay the bill. The bankruptcy court would periodically review the bills. It was also agreed that the Examiner would be compensated on an hourly basis, that being $180.00/hour for work performed in 1996 and $185.00/hour for work performed in 1997. The Examiner's interim compensation was to be paid from Big Rivers' "cash collateral,"[8] The interim compensation order also stated that "the procedure ... shall not otherwise excuse the Examiner from compliance with all applicable provisions of the Bankruptcy Code."

On December 3, 1996, the Examiner revisited the fee request with Al Taylor and Richard Hebner of BONY, complaining that he understood that its local counsel, Joan Cooper, had objected to the U.S. Trustee's office about his receiving a percentage-based fee. Mr. Hebner of BONY said that if she had, it was unauthorized, and BONY did not object to his receiving compensation of up to 3%.

Although the Examiner had been communicating with Mapco, Chase and BONY to obtain a percentage fee agreement, the Examiner says that in an *ex parte* off-the-record conversation on January, 23, 1997 with the bankruptcy judge, he sought and received permission to "begin to negotiate my percentage-based fee with the Banks [Chase and BONY] and Mapco." The Examiner does not, however, say that he sought or received judicial permission to *solicit* payments from these unsecured creditors.

7. The events prior to the November 13, 1996 hearing are reflected in the Memorandum opinion of the bankruptcy court dated November 6, 1997.

8. "Cash collateral" is cash or cash equivalents in which the estate and another entity (here, RUS as mortgagee) have an interest.

11 U.S.C. § 363(a). A debtor may not use cash collateral without either the other entity's consent or court authorization after notice and hearing, 11 U.S.C. § 363(c)(2), conditioned on provision of adequate protection to that entity if it requests it, 11 U.S.C. § 363(e).

Although the Examiner never sought or received judicial permission to *solicit* payments from these unsecured creditors, the Examiner told Thompson at least twice in 1997 that the bankruptcy judge authorized him to seek payments from unsecured creditors.

On January, 22, 1997, Big Rivers filed a proposed plan of reorganization.

Shortly after Big Rivers filed the proposed plan, the Examiner telephoned BONY, Chase and Mapco to request that they agree to pay the Examiner a pro-rata share of his percentage-based compensation based on the proportion of the enhanced value of the Big Rivers estate which was received by each of these creditors. For example, the Examiner asked that Mapco pay him $180,000. The Examiner also suggested having these creditors put his compensation in an escrow fund in Big Rivers' name.

The Examiner then sent Chase, BONY and Mapco letters to "confirm our telephone conversation," and requested written confirmation of their 1996 agreements to pay him 3% of the "new value" they received in the bankruptcy, and specifying the amounts he expected each of them to pay him. In his January 28, 1997, letter to Patrick A. Daniello of Chase, the Examiner restated he was to receive from Chase 3% of the "new value" it got, and computed the amount due from Chase as $835,335:

> This will confirm our telephone conversation of Friday, January 24, 1997 relating to the Examiner's compensation. Chase, through you, and I had an oral agreement reached during the [October 31/November 1, 1996] Washington conference that I would receive compensation of 3% of the new value that Chase received in the case. . . . It is this figure of $835,335.00 which was discussed last Friday and which we agreed was reasonable compensation for the Examiner

to receive from Chase at the closing of the plan.

In his January 29, 1997, letter to an attorney for Mapco, the Examiner sought $180,000 from Mapco:

> As you will recall at the Washington meeting, which your law firm hosted, it was agreed that I, as Examiner, would receive 3% of the new value your client received in the case. . . . Your client will receive $6,000,000.00 under the proposed plan, all of which constitutes new value produced during this case. The agreed upon compensation of 3% of $6,000,000.00 equals $180,000.00 to be paid by MAPCO to me as Examiner. I have agreed with the suggestion of Pat Daniello that the payments from MAPCO and the Banks be deposited into an escrow account on the closing date under the plan. . . . As I have in the past, . . . **I will try to maximize your client's recovery as long as it is consistent with my duties as Examiner**. . . . [P]lease confirm, in writing, that MAPCO's agreement relating to my compensation as Examiner is as set forth in this letter.

(Emphasis added).

In his January 30, 1997, letter to counsel for BONY, the Examiner restated that he was to receive 3% of the "new value" that bank got, computed the amount he wanted from that bank as $589,665, and asked that the money be put in escrow:

> This letter will confirm our telephone conversation of Monday, January 27, relating to the issue of compensation to be paid to the Examiner by Bank of New York (BONY) in the Big Rivers case. At the Washington meeting . . . I first discussed, and obtained the agreement of the Banks and MAPCO that I, as Examiner, would receive 3% of the new value those creditors received in this

case.... I again raised this issue with Richard and Al [BNY employees], as well as with you and others, at our meeting in your office on December 3, 1996. I was specifically told by Richard and Al that they fully concurred with the aforestated 3% compensation agreement,
. . . .

"I set forth the aforestated history solely because during our conversation **you expressed hesitation on the fact that BONY, as opposed to the debtor (and the RUS), would be paying the 3% compensation. Again, while I do not believe this will be a problem with BONY, based on the statements both Richard and Al made to me on December 3, we do need to address this point if it is a problem....** While I **have had two oral agreements with Richard and Al relating to the compensation that BONY would pay to me, as Examiner, please confirm, in writing, that BONY's agreement relating to payment of my Examiner's fee based on the increase in new value BONY has received during the course of this case is as set forth herein."**
(Emphasis added).

None of these letters mention that the Examiner's so-called fee arrangement was subject to the approval of the bankruptcy court.

Mapco and BONY, through letters to the Examiner, denied any such fee arrangement existed. BONY's counsel, in a letter dated February 6, 1997, cautioned the Examiner: "It is inappropriate, however, for any court-appointed fiduciary to seek compensation directly from individual creditors." Mr. Thompson, counsel for Chase, in a letter dated February 4, 1997, replied to the Examiner that in the January 24, 1997, telephone call, not earlier, "Chase agreed in principle, subject to agreeing on calculation of the actual amount" to fund indirectly "its *pro rata* share" of the Examiner's fee. "Pat [Daniello], who has reviewed this letter," Mr. Thompson continued, "wishes me to confirm that Chase intends to stand behind that agreement."

Thus, the January and February, 1997, correspondence includes (1) the Examiner's repeated insistence that BONY, Chase and Mapco agreed in late 1996 to pay him money for obtaining recoveries for them, (2) a denial by two of them, and (3) the third's insistence that they reached a deal early in 1997, not late in 1996.

In the January 24, 1997 telephone call from the Examiner to Mr. Daniello of Chase, they reached an agreement in principle on the subject of the Examiner's compensation whereby Chase agreed to pay the him a fee calculated according to how much he increased its recovery or decreased its exposure.

None of the Examiner's oral or written communications with the unsecured creditors regarding his compensation were disclosed to RUS, the U.S. Trustee, or other parties in the case. It is axiomatic that the RUS, the U.S. Trustee and the other parties were entitled to rely on the Examiner's impartiality and disinterestedness.

On March 26, 1997, the Examiner filed an interim application for compensation, including a "Rule 2016(a) Disclosure" together with a statement that he was a "disinterested person." The Disclosure says nothing about the payments he expected from BONY, Chase or Mapco for his fees. In his First Interim Application, the Examiner states:

*Rule 2016(a) Disclosure*
Pursuant to Rule 2016(a) the Examiner also states:

 (1) Payments heretofore made to him, as identified above, as Examiner, total $136,469.50 in fees and $4,846.12 in ex-

penses prior to his last billing and $45,528.50 in fees and $1,620.88 in expenses are scheduled to be paid on or about April 1, 1997.

(2) The source of such payments, was, to the best of the Examiner's knowledge, the cash collateral of the debtor.

(3) No previous compensation for the Examiner's services has been shared, and no agreement between the Examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(4) This is an interim application.

*Disinterested Person*

The Examiner is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed.

*See* Exhibit C, Examiner's First Interim Application for Allowance of Compensation and Reimbursement of Expenses.

Throughout this time, the Examiner was also working to resolve disputes and mediate conflicts, and attempting to negotiate a global settlement and a consensual plan of reorganization to RUS. According to the Examiner, he met with BONY, Chase and Mapco within three days of his appointment, and "was intensively involved in settlement negotiations in an effort to reach a consensual plan," that he met with "dogged refusal" from Big Rivers, endeavored successfully to increase the recoveries of the these creditors, resolved a dispute between BONY and RUS, and advocated courses "strenuously" opposed by Big Rivers and the United States. He criticized RUS as "obstructive" and in "active opposition" to his efforts. Indeed, the Examiner characterized the relationship between RUS and him as "quite hostile" and "heated" at one point.[9]

On June 5, 1997, the Examiner filed a paper entitled Request For Payment of Administrative Expense, stating that the maximum amount "he may seek to have the Court award him upon proper notice and motion" to be $4.41 million. The Examiner also stated that he "believed that the new value could be brought into the estate for the benefit of the creditor, and discussed with various parties that he would seek a fee, not to exceed 3% of the new value brought into the estate, if such new value was brought into the estate." The Examiner also filed a Proof of Claim,

---

**9.** One source of contention between the RUS and the Examiner stems from events prior to Big Rivers' filing for bankruptcy. On August 26, 1996, Big Rivers and PacificCorp Energy Company (PKEC) entered into an Omnibus Agreement (agreement) which generally provided that PKEC would lease Big Rivers' electric generation plants, provide power to Big Rivers' customers, and market any excess power. The agreement was reached in contemplation of Big Rivers' filing Chapter 11 and at the time of filing Chapter 11, Big Rivers' attached the agreement as part of its proposed plan of reorganization. Shortly after Big Rivers' filed its proposed plan, another power company, LG & E, approached Big Rivers with two plans to lease or purchase substantially all of its assets, both of which exceeded the value under the agreement by several million dollars. Big Rivers rejected LG & E's offers, believing that a "no shop" clause in the agreement prevented it from negotiating with other parties. Faced with the prospect of a deal that could increase Big Rivers' estate, the bankruptcy court ordered an auction with a condition that any bids compete with the PKEC agreement. Big Rivers opposed the auction, as did RUS, who supported the PKEC agreement. The Examiner supported an auction. PKEC was upset about the auction and did not submit a bid; LG & E was the highest bidder, with a price of $50,000,000.00 greater than PKEC's plan. Big Rivers' Amended Plan of Reorganization was then submitted based on the LG & E bid. Thus, the RUS and the Examiner clearly had differing views on a plan of reorganization.

stating that his claim will not exceed $4.41 million. *See* Exhibit D. This is the first time that the Examiner's intention to seek a percentage-based fee, or that he discussed his fee with creditors, was publicly disclosed. The Examiner did not disclose his discussions with BONY, Chase and Mapco to have his percentage-based fee paid by them out of the distributions to them.

On June 9, 1997, Big Rivers' negotiated, consensual plan of reorganization was confirmed. From October 1996 to April of 1999, Big Rivers paid the Examiner approximately $500,000.00 in hourly fees sand $14,000.00 in expenses from its cash collateral. From December 1996 to November 2000, Big Rivers paid the Examiner's law firm approximately $350,000.00 in fees and $5,500.00 in expenses.

On July 24, 1997, the Examiner filed his Second Interim Application, which also contained a statement that he was disinterested and a Rule 2016(a) disclosure. *See* Exhibit E.

In July of 1997, the Examiner and Chase memorialized their "agreement" as to the Examiner's compensation in a letter dated July 31, 1997. The agreement generally states that the Examiner would seek a $4,248,000.00 fee, based on 3% of the value added to the estate, to be paid by Big Rivers from all sources available to it, such fee to be contingent upon Big Rivers' consummating the plan of reorganization. It further states that Chase would support the application and that if the bankruptcy court requires Big Rivers' creditors, not Big Rivers, to pay the Examiner's fee, that Chase would be responsible for no more than $835,335.00 (3% of the enhanced value to Chase's claim).

Thompson stated at deposition that the time between when Chase agreed to pay the Examiner a fee and July 31, 1997 when it executed the agreement, Mr. Thompson,

on behalf of Chase, continued to ask the Examiner to take specific positions and negotiating postures that often were inimical to the United States, demanding of the Examiner that money be paid to his client instead of RUS, and even doing legal research for the Examiner to substantiate that position.

Also on July 31, 1997, the Examiner filed a Preliminary Pleading regarding Application for Allowance of Compensation and Reimbursement of Expenses, disclosing the agreement with Chase noted above. Under the heading "Negotiations Relating to the Examiner's Fees," the Examiner states:

As previously stated in pleadings, and as disclosed to the court, during the October 31—November 1 conference in Washington, the Examiner discussed with the Banks, MAPCO, and RUS the Examiner's belief that he should be compensated for new value brought into the estate on a percentage basis (up to 3%). The Banks and MAPCO agreed with the percentage based approach, while the RUS stated, at that time, it would not agree or disagree with a percentage compensation to the Examiner.

The Court instructed the parties on July 1, 1997 to attempt to negotiate the Examiner's fee request. As a result of that directive, the Examiner has begun additional negotiations. As of the date of filing this pleading, those negotiations have been concluded only with Chase. (See a copy of agreement attached hereto.)

The Examiner attached the July 31, 1997 letter from Chase to him. In that letter, Chase related it would to pay him a "success fee." This is the first time that the Examiner's intention to have his percentage-based compensation be paid *by these*

*creditors* of Big Rivers was publicly disclosed. *See* Exhibit F.

After receiving the Examiner's July 31, 1997 paper, Mapco's attorney wrote him privately that his statement was "incorrect, at least as to my client." The Examiner responded to Mapco's attorney in a letter of August 19, 1997, maintaining that his prior statement was "correct," and insisting that he reached a fee arrangement at the meeting two weeks after his appointment: "As far as I am concerned, my agreement with Chase Manhattan is consistent with the agreement reached at the October 31–November 1 [1996] settlement conference."

The Examiner's July 31, 1997 filing and its attachment did not disclose the background, nature, timing, and terms of the compensation agreement the Examiner maintained he had reached in 1996.

In August 1997, the government asked for discovery into the Examiner's fee arrangements. On September 16, 1997, RUS objected to the continuing use of its cash collateral to pay the Examiner and requested an order forcing him to disgorge those fees already paid. Beginning six days later, the bankruptcy judge enjoined filings and discovery relating to the Examiner's fees.

On January 2, 1998, the Examiner filed his Third Interim Application for Allowance of Compensation and Reimbursement of Expenses, requesting $88,485.50 for fees and $1,750.72 in expenses. This application also contained a Rule 2016(a) disclosure, stating in relevant part:

(3) The source of such payments [prior interim payments] was, to the best of the Examiner's knowledge, the cash collateral of the debtor.

(4) No previous compensation for the Examiner's services has been shared, and no agreement exists between the Examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(5) The Examiner has attempted to settle with certain parties in this case his compensation. As a result of those settlement negotiations, the Examiner has agreed to certain matters relating to his fee as specified in a letter from Pat Daniello to the Examiner dated July 31, 1997, which letter has heretofore been disclosed to the court and those parties or entities involved in the Examiner's compensation.

. . . .

*Disinterested Person*

The Examiner is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed.

*See* Exhibit G, attached.

At a hearing one year later in September 1998, the bankruptcy judge again permitted filings on the issue of the Examiner's compensation, but continued the ban on discovery and indicated he would hear no evidence. During the September 1998 hearing, the Examiner asserted that he "has never said there was a side agreement with" Mapco.

In reaction to the Examiner's statement in open court that he had never said he had a side fee agreement with Mapco, Mapco filed a copy of each of the Examiner's letters to it of January 29, 1997 and August 19, 1997 in which he insists he had such an agreement with it. BONY then filed the January 30, 1997 letter in which the Examiner asserted the existence of a side fee agreement with it, together with its response.

With the filing of these letters, it was made known publicly for the first time that the Examiner's so-called intention to seek a percentage fee was in fact an intention to seek a percentage fee paid by Mapco, Chase and BONY based on the new value brought to them in the estate.

On October 13, 1998, the Examiner filed his Final Fee Application, requesting approximately $4.41 million in compensation. This amount was determined by a base compensation (as per the prior set hourly rate) of $530,928.74 and an enhancement of $3,879,071.25, which represented 3% of the new value brought to Big Rivers' estate (approximately $147 million). Although the Examiner had previously announced his intention to request a percentage-based fee, this is the first time that the Examiner formally requested such a fee.

### C. Disgorgement

On October 23, 1998, the U.S. Trustee filed a motion to disgorge all payments paid to the Examiner on the grounds of misconduct in seeking an enhanced fee.

In response to the U.S. Trustee's motion, the Examiner characterized his own statements in his letters of January 28, 29 and 30, 1997 as intentionally untrue and made only for purposes of negotiation, as follows:

A common tactic used in negotiations is to make a statement, *as if it were fact,* even though the statement is incorrect and is known to be incorrect. The Examiner used this common place tactic in his January, 1997 letters to Chase and counsel for Bank of New York and MAPCO, asserting, as a fact, that an agreement had been reached at the Washington settlement conference, wherein these creditors would pay the Examiner 3% on any new value their clients received.

On December 4, 1998, the bankruptcy judge disqualified himself from hearing the Examiner's fee issue and entered a separate order transferring the case to another bankruptcy judge. The bankruptcy judge to whom the case was assigned continued the prohibition on discovery as to the Examiner's compensation. On March 26, 1999, the bankruptcy judge issued a decision on the Examiner's Final Fee application, without an evidentiary hearing, awarding the Examiner $2,638,205.00. This amount represented the Examiner's base compensation of $527,641.00 (the amount requested less travel expenses of $3,287.77) and an enhancement of four times the base compensation, for a total award of $2,638,205.00. *See In re Big Rivers,* 233 B.R. 754 (1999). Big Rivers, the government, and the Examiner appealed to the district court. The government raised the disgorgement issue on appeal.[10]

On appeal, the Examiner also continued to characterize his own statements in his January 1997 letters to the unsecured creditors as intentionally untrue:

The Examiner chose to commence his negotiations of a percentage fee with MAPCO and the Banks by employing a common tactic in *settlement negotiations,* which is to state a matter as if it is a fact even though it is not. Employ-

---

**10.** In addition to the Examiner, other professionals involved in this case, including counsel for Big Rivers, sought compensation. Big Rivers did not oppose the requested compensation. On April 5, 1999, the bankruptcy court approved the fee applications in part. See *In re Big Rivers,* 233 B.R. 768 (1999). The professionals appealed to the district court. Big Rivers did not oppose the professionals' appeal.

In July 1999, the Examiner filed a motion in the district court to appoint amicus curiae to defend the decision of the bankruptcy court on appeal. The motion was denied on the grounds that amicus was not necessary.

ing this common settlement technique, the Examiner wrote letters to counsel for both Banks and to counsel for MAP-CO stating that their clients had agreed to pay a percentage-based fee to the Examiner if they received new value as a result of the Examiner's efforts.

On August 24, 2000, the district court affirmed in part and reversed in part the bankruptcy court's order regarding the Final Fee Application. The district court affirmed the base compensation award but reversed the award of enhanced compensation. The district court remanded the disgorgement issue to the bankruptcy court. See *In re Big Rivers*, 252 B.R. 676 (W.D.Ky.2000).

Also on that day, the district court issued a separate order finding that the bankruptcy court did not err in awarding interim compensation to the Examiner. As to the Examiner's fees incurred after October 12, 1998, the district court held that it would be appropriate to award fees incurred pursuing and defending his base compensation award but inappropriate to award the Examiner for fees incurred in pursuing and defending the enhancement award. *See In re Big Rivers*, 252 B.R. 670 (W.D.Ky.2000). The district court then remanded the matter to the bankruptcy court for determining what part of the requested fees was spent in pursuing the base compensation amount and what amount was spent pursuing a fee enhancement.

The Examiner appealed to the Court of Appeals for the Sixth Circuit, which dismissed the appeal for want of jurisdiction. *See In re Big Rivers*, Nos. 00–6560; 00–6636 through 00–6640 (6th Cir. Jan. 12, 2001).

### D. Proceedings in this Court

On March 8, 2001, the bankruptcy court ordered that the case be transferred to the district court for a determination of whether to withdraw the order of reference.

On March 25, 2001, the district court withdrew the order of reference. After recusal by the judges of the Western District of Kentucky, the issue was assigned to this Court by the Chief Judge of the Sixth Circuit on March 28, 2001.

Thereafter, Big Rivers filed a motion to modify the July 15, 1999 Order which directed Big Rivers to pay the monthly attorney fees of the Examiner's counsel. The Court granted the motion. See Order, dated April 12, 2001. The Court explained: "Given the possibility that the Examiner may not be entitled to payment of his counsel's fees in the matter of disgorgement and with nothing in the record to suggest if counsel's fees are awarded, the Debtor would not be able to pay them, it appears appropriate to suspend payment pending final decision on the matter. It does not seem right that a party should be required to finance opposition to a motion for disgorgement in good faith by the party . . . Should the motions [for disgorgement] be denied, the Examiner may petition for payment of his counsel fees in defending against the motions."

On May 15, 2001, following oral argument, the Court granted Big Rivers' motion for Release of Escrowed Payments, finding that Big Rivers is sufficiently solvent to cover any fees that it may have to pay to the Examiner and his counsel.

### IV. Conclusions of Law

#### A. The parties' arguments

The government requests a total disgorgement of all monies paid to the Examiner and his counsel on the grounds that the Examiner engaged in misconduct in soliciting secret fee arrangements with BONY, Chase, and Mapco whereby they would pay him a percentage of his compensation (3%) based on the increased value

brought to the estate and to their respective claims. The government argues that the Examiner was not a disinterested person as required under bankruptcy law. The Examiner argues that the government lacks standing, that the there was nothing improper regarding his asking for a percentage-based fee, and that nothing was done in secret, that no agreements were reached except as to Chase, which was immediately disclosed.

### B. Standing

As an initial matter, the Examiner argues that the RUS lacks standing to object to his fees. The argument lacks merit. The bankruptcy court already ruled that the government (the RUS and the U.S. Trustee) have standing to object to the Examiner's compensation. *See* Memorandum Opinion of June 22, 1998. Although the district court found that the bankruptcy court did not consider the disgorgement issue and that the "Examiner raises some interesting questions concerning the RUS's standing," the district court did not address the issue, having found that "the U.S. Trustee has properly raised the disgorgement issue on appeal." *In re Big Rivers*, 252 B.R. at 687. The Court will not revisit the issue; the government has standing to raise the issue.

### C. The law

#### 1. Disinterested person

It is clear that the Examiner must be a "disinterested person" within the meaning of the Bankruptcy Code and Bankruptcy Rules. *See* 11 U.S.C. § 1104, Fed. Bankr.R. 2014(a). The Bankruptcy Code defines "disinterested person" in part as a person that—

(A) **is not a creditor,** an equity security holder, or an insider;

. . . .

and

(E) **does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;**

11 U.S.C. § 101(14) (emphasis added).

Following the code, Bankruptcy Rule 2014 outlines the procedural mechanism for maintaining disinterestedness by requiring the potential attorney for the debtor to set forth under oath any "connections with the debtor, creditors, [and] any other party in interest." Fed. R. Bankr.P. 2014(a). These disclosure requirements apply to all professionals and are not discretionary. The professionals "cannot pick and choose which connections are irrelevant or trivial." *In re EWC, Inc.*, 138 B.R. 276, 280 (Bankr.W.D.Okl.1992). "[C]ounsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation." *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1998); *see also Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir.1994). As the Court of Appeals for the Seventh Circuit stated, "this procedure is designed to ensure that a 'disinterested person' is chosen to represent the debtor. This requirement goes to the heart of the integrity of the administration of the bankruptcy estate. The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate." *United States v. Gellene*, 182 F.3d 578, 588 (7th Cir.1999).

**596**

In *Michel v. Federated Dep't Stores, Inc.*, 44 F.3d 1310, 1319 (6th Cir.1995), the Sixth Circuit made clear that the disinterested requirement is to be taken seriously, holding that disinterestedness is a prerequisite for receiving compensation, stating:

Section 328(c) allows a district court to completely deny compensation "if, at any time" during the appointment the professional is not disinterested within the meaning of § 327(a). The district court reasoned that the statute's language—"at any time"—included the time of appointment and, thus, § 328(c) bestowed upon the bankruptcy court the discretion to compensate a professional who was invalidly appointed in the first place. *See United States Trustee v. Price Waterhouse*, 19 F.3d 138, 142 (3d Cir.1994) ("[W]e interpret [§] 328(c) to mean that if a non-'disinterested' professional person is improperly employed, or if a professional person ceases to be 'disinterested' 'at any time during such employment,' the court may deny compensation."). Yet, we think the plain language of § 328(c) limits the bankruptcy court's discretion to grant or deny compensation to "a professional person employed under § 327." *See* 11 U.S.C. § 328(c). Since Lehman Brothers was an interested person from the very outset, it was never "a professional person employed" under that section. As is evident, the district court's construction of § 328(c) gives no effect to the limitation imposed by § 327(a).

We believe that § 328(c) is not controlling here. Rather, the decision to grant compensation is governed by § 330(a)[11] and that provision, like § 328(c), clearly requires a valid professional appointment under § 327(a) as a prerequisite to an award of compensation.

The government argues that even if the Examiner was disinterested when he was selected in October of 1996, he was no longer disinterested when he approached Mapco, BONY and Chase about his compensation at the Washington meetings and solicited their agreement to pay him a percentage of his compensation. The Examiner argues that he was disinterested because (1) even though he discussed his compensation with BONY, Chase and Mapco during the Washington meetings, there was never any agreement, (2) it was clear that any fee agreement would have to be approved by the bankruptcy court, (3) the Examiner received permission from the bankruptcy court to discuss his compensation with these creditors, and (4) when the Examiner and Chase reached an agreement, it was immediately disclosed.

The government's argument is well-taken; the Examiner misses the point. The Bankruptcy Code and Rules mandate that a professional, such as an Examiner, be a neutral, disinterested party in the case. The moment that the Examiner approached three of Big Rivers' largest unsecured creditors and broached the subject of his compensation, suggesting that they pay him a percentage-based fee based on the "success" or "new value" he brought them to the estate, he was no longer a disinterested party. Whether or not such an agreement was reached or whether an agreement was subject to the approval of the bankruptcy court is irrelevant. What is relevant is that the Examiner sought to have his compensation tied to the enhanced value brought to the estate and, in particular, tied to what BONY, Chase and Mapco, received on their claims from the estate. It is this conduct that demonstrates that the Examiner was not disin-

---

11. Section 330(a) provides that "the court may award [reasonable fees and expenses] ... to a professional person employed under [§] 327." 11 U.S.C. § 330(a)(1)(2).

terested and indeed was very interested in the outcome of the bankruptcy. The Examiner became a real party in interest by seeking to hinge his fee on the amount of money brought into the estate.

Although the government has not provided specific references in the record where the Examiner took positions inimical to it and in favor of BONY, Chase and Mapco, it does offer the deposition testimony of Thompson of Chase who stated that he asked the Examiner, on behalf of Chase, to take specific positions and negotiating postures that often were inimical to the government, indicating that money be paid to his client instead of RUS, and even doing legal research for the Examiner to substantiate this position. It requires no stretch of the imagination to find that the Examiner would seek to advance the position of these creditors, even at the expense of others, including the government, in order to maximize his return in the case. Even if he did not, the sheer fact that the Examiner's actions create at least an appearance of a conflict of interest indicates that he was not disinterested.

Although the order appointing the Examiner did not indicate how he ultimately was to be paid, it is clear that the Examiner was to be paid, on a interim basis, out of Big Rivers' cash collateral. The Examiner viewed his role as that of a trustee, or quasi-trustee and this fact was made known to the government early on in the case. Shortly after his appointment, namely at the October–November 1996 meetings in Washington, the Examiner made his fee intentions known to all parties—including the government—that he was going to seek compensation in the amount of a percentage of the enhanced value he brought to the estate. There is nothing improper in the abstract with the Examiner's statements. However, the Examiner's intention to have his compensa-

tion paid by BONY, Chase and Mapco was known only to the Examiner and these creditors. This was improper. At this point, the Examiner became an interested person. By tying his compensation on the "new value" he brought to the estate, the Examiner became inextricably linked to any settlement. Also, by seeking to have the three largest unsecured creditors pay him his enhanced compensation, he became inextricably linked to them and their positions with respect to any proposed settlement. The Examiner was no longer a neutral disinterested person in Big Rivers' bankruptcy, but rather a person with a real stake in whatever consensual plan of reorganization might be approved. Such actions are wholly at odds with the law requiring disinterestedness.

As the attached exhibits show, the Examiner affirmatively misled the government and others by filing certifications that he was a "disinterested person." He continued his deceit at least until late September 1998 when he falsely maintained in open court that he "has never said there was a side agreement with" Mapco. Under *Michel*, the Examiner's lack of disinterestedness means that he was not a properly appointed professional and is therefore not entitled to any compensation.

### 2. Duty to disclose

The government also argues that the Examiner violated the disclosure provisions of 11 U.S.C. § 329 and Bankr.R. 2016. Section 329 of the Bankruptcy Code provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, **shall file with the court a statement of the compensation paid *or agreed to be paid,*** if such payment or agreement was made after one year before the date of the filing of

the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

(Emphasis added).

Section 329 is implemented by Bankruptcy Rule 2016(b) and 2017. Rule 2016 provides:

(a) Application for compensation or reimbursement

An entity seeking interim or final compensation for services, or reimbursement of necessary expenses, from the estate shall file an application setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. **An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised,** whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required. The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is filed by a creditor or other entity. Unless the case is a chapter 9 municipality case, the applicant shall transmit to the United States trustee a copy of the application.

(b) Disclosure of compensation paid or promised to attorney for debtor

Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, **the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney,** but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

(Emphasis added).

 As the Court of Appeals for the Sixth Circuit recently stated: "[i]t is clear that an attorney in a bankruptcy case has an affirmative duty to disclose fully and completely all fee arrangements and

payments." *In re Kisseberth,* 273 F.3d 714, 720 (6th Cir.2001) (citing *In re Plaza Hotel Corp.,* 111 B.R. 882, 883 (Bankr. E.D.Cal.1990)). Moreover, it is clear that the bankruptcy court has broad discretion to deny compensation where an attorney fails to satisfy the Code and Rules. *In re Downs,* 103 F.3d 472, 479 (6th Cir.1996). Disgorgement may be proper for even a negligent or inadvertent failure to disclose. *Kisseberth,* 273 F.3d at 721 (citing *In re Park–Helena Corp.,* 63 F.3d 877, 882 (9th Cir.1995)).

▮▮▮▮▮ The government says that the Examiner violated his statutory duties by not disclosing all circumstances surrounding his compensation when he filed his several Rule 2016(a) disclosures. The Examiner argues that he only reached an agreement with Chase and it was immediately disclosed. The Examiner's argument is not credible. First, although the Examiner now says that he never reached an agreement with Mapco, Chase, and BONY during the Washington meetings, his letters written in January of 1997 belie this assertion. It is only when the government questioned the Examiner's actions that the Examiner retreated from the position in his letters and made the assertion that his statements were intended for "negotiation." In any event, at a minimum, the Examiner's fee discussions with Mapco, Chase, and BONY should have been disclosed so that the bankruptcy court could then determine whether the Examiner should remain employed by the estate. As one district court stated:

In situations where counsel is aware of apparent conflicts which counsel believes are outweighed by other factors, the conflicts must be disclosed. The court then can exercise its independent judgment. The decision concerning the propriety of employment should not be left exclusively with counsel, whose judg-

ment may be clouded by the benefits of the potential employment. The exercise of the court's independent and informed discretion is an important protection to clients who may not be sophisticated in assessing conflicts of interest and to the court system which has an interest in avoiding even the appearance of impropriety.

*In re Roberts,* 75 B.R. 402, 411 (D.Utah 1987).

The Examiner should have known that the act of *soliciting* the three largest unsecured creditors and suggesting that they pay his final fee based on the "new value" the Examiner brought them to the estate was at least an apparent conflict of interest with the Examiner's obligation of neutrality that should have been disclosed. Instead, as the attached exhibits show, the Examiner attested to his disinterestedness and impartiality. Absent the Examiner's disclosure, the bankruptcy court had no means to determine whether the Examiner should remain employed by the estate. The Examiner was required to disclose any agreements as to his expected compensation, including the anticipated source of his compensation. This was not done.

Moreover, while the Examiner makes much of the fact that he disclosed his agreement with Chase, his disclosure was by no means complete. Nowhere does he disclose the conversations in Washington or the letters after that. Overall, the Examiner failed to disclose his fee arrangements as required by the Bankruptcy Code and Rules and therefore must disgorge all compensation received.

### 3. Public Policy

The government also argues that the Examiner's attempt to obtain compensation agreements from Mapco, Chase, and BONY violate public policy at least implies that such actions are criminal under 18

U.S.C. § 152(6).[12] In light of finding that the Examiner must disgorge his compensation because he was not a disinterested person and because he violated his duty to disclose, the Court declines to address this argument.

### 4. A Word About *Ex Parte* Communications and the Bankruptcy Court's So–Called Approval

The Examiner makes much of the fact that the bankruptcy court gave him permission during an *ex parte* conversation with the bankruptcy judge to discuss his fee with the unsecured creditors and to negotiate a percentage-based fee. Assuming that such "permission" was given, the Examiner again misses the point. As the government points out, it is not the propriety of the Examiner discussing an enhanced fee that is at issue, or whether or not he told these creditors that he would seek a percentage fee from the estate, but rather it is his undeniable solicitation of payments from Mapco, Chase, and BONY, tied to the value he brought them to the estate that is at issue and the Examiner being placed in the inevitable position of advocating for these creditors. Significantly, the Examiner does not claim that he had permission to solicit these unsecured creditors for payment.

### 5. Enhanced Compensation in General and the Examiner's Efforts in the Case

■ The Examiner cites a plethora of authority for the proposition that it is not inappropriate for a professional in a bankruptcy case to receive compensation other than, or beyond, an hourly rate. *See In re*

*MiniScribe Corp.*, 257 B.R. 56 (Bankr. D.Col.2000); *In re Merry–Go–Round Enterprises,* 244 B.R. 327 (Bankr.D.Md.2000); and *In re Hers Cosmetics Corp.*, 114 B.R. 240 (Bankr.C.D.Cal.1990). Indeed, an increase in compensation is appropriate where the parties did not foresee "the time, the pressures, or the complexity of [the] case or the phenomenal results achieved." *In re Warrior Drilling & Eng'g Co.,* 9 B.R. 841, 847 (Bankr. N.D.Ala.), *modified on other grounds,* 18 B.R. 684 (Bankr.N.D.Ala.1981); *In re Malcon Developers, Inc.,* 138 B.R. 677 (Bankr. N.D.N.Y.1992). In *In re Warrior,* the court found that these factors were sufficient to make an original agreement, which was entered into for maximum compensation at an hourly rate, " 'improvident,' within the meaning of § 328(a)." *In re Warrior,* 9 B.R. at 847. The bankruptcy court in this district summarized the factors as follows used in awarding an increased compensation:

(1) The attorney seeking compensation had a reasonable belief that he was providing representation on a contingency fee basis;

(2) The results obtained went beyond reasonable expectations;

(3) The attorney assumed great risk in taking on representation of the case;

(4) The attorney persevered where others would have curtailed their efforts;

(5) The attorney's efforts resulted in a significant infusion of funds into the debtor's estate;

(6) The attorney faced a strong adversary and unforeseen pressures; and

---

12. This section provides:

§ 152. Concealment of assets; false oaths and claims; bribery

A person who—

. . . .

(6) knowingly and fraudulently gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act in any case under title 11;

. . . .

shall be fined under this title, imprisoned not more than 5 years, or both.

(7) The litigation was voluminous and complex.

*In re Omegas Group, Inc.,* 195 B.R. 875, 880 (Bankr.W.D.Ky.1996) (*citing In re Malcon Developers,* 138 B.R. at 680–81; *In re Warrior,* 9 B.R. at 847; *In re Land,* 138 B.R. at 71). Incidentally, *Omegas Group* involved compensation due to Schilling, as counsel for the Trustee, who was employed under a contingency fee arrangement.[13] In awarding Schilling his contingency fee, the bankruptcy court examined the above factors and found that Schilling's efforts in the case warranted the fee.

The Court does not disagree with this authority, but it does the Examiner little good. Whether or not the Examiner could have requested and received an enhanced compensation is not questioned. What is questioned is the way in which the Examiner sought to obtain this enhanced compensation.

Moreover, the Examiner makes much of the fact that the record contains several instances where the bankruptcy court applauded the Examiner's "herculean" efforts in this case to support his argument that requesting an enhanced fee was not improper. This argument too misses the point. First, it is noted that the district court, in reversing the Examiner's enhanced compensation, found the Examiner's actions to amount no more than what was expected of him. Second, as noted by the government and Big Rivers at the hearing on April 10, 2002, the relative speed with which Big Rivers' bankruptcy was resolved in terms of filing a consensual plan of reorganization, including having an auction, was due to the efforts of *all parties,* including the bankruptcy judge, and not just the Examiner.

Third, although the Examiner was initially awarded an enhanced compensation by the bankruptcy court for his "extraordinary effort," based on a "rigorous, exhaustive, and lengthy scrutiny of the entire record," this decision was made without any discovery being allowed or a record made as to the Examiner's contribution to the case. Rather, a careful review of the bankruptcy court's decision awarding the Examiner enhanced compensation shows that the Examiner's award was based on such factors as the speed with which the case was resolved, the fact that other professionals, including Big Rivers' counsel were awarded substantial compensation, a view that the Examiner had performed many roles in the case, including that of a trustee and a creditors committee, and the fact that the prior bankruptcy judge had made several public comments praising the Examiner's skill. Also an apparent factor in the decision was the bankruptcy court's view that the RUS had acted badly in advocating for the PKEC deal. In any event, the Examiner's efforts in moving the case to resolution, however laudable, are irrelevant to the question of whether the Examiner acted inappropriately with regard to his compensation. In other words, the extent of the Examiner's *contribution* to the estate is moot in light of finding that his *conduct* justifies total disgorgement of all compensation.

## V. Conclusion

Although there is nothing in the Bankruptcy Code or Rule which prevent the Examiner from *requesting* any type of fee, including an enhanced fee, and any such fee is ultimately determined by the bank-

---

13. The U.S. Trustee had argued that Schilling was not disinterested and therefore his appointment was improper. The bankruptcy court rejected this argument as "procedurally and substantively erroneous." 195 B.R. at 879.

ruptcy court, this fact alone does not support the Examiner's actions in actively soliciting BONY, Chase and Mapco for payment of his compensation. Indeed, while the Examiner could have properly requested and be entitled to an enhanced fee, *it is the way in which the Examiner pursued an enhanced fee* that requires disgorgement. The Bankruptcy Code and Rules clearly prohibit the Examiner's actions.

▮▮▮ Although total disgorgement of the Examiner and the Examiner's counsel's fees appears harsh, the Court is particularly mindful of the following statement from the Sixth Circuit:

> When a court metes out a sanction, it must exercise such power with restraint and discretion. The sanction levied must thus be commensurate with the egregiousness of the conduct. In cases involving an attorney's failure to disclose his fee arrangement under § 329 or Rule 2016, however, the courts have consistently denied all fees.

*In re Downs,* 103 F.3d at 478 (citations omitted). Here, the nature of Examiner's conduct warrants total disgorgement.

The Examiner by early on staking out a personal position on his compensation and then by attempting to obtain agreement from Big Rivers' three largest unsecured creditors to be responsible for a share of it, disabled him from acting in the interests of all creditors, secured and unsecured. In addition, the Examiner hid his self interest from the U.S. Trustee, who selected him, and who is charged with oversight responsibility. The Examiner became an interested party in the Chapter 11. He also failed to disclose the nature and extent of his disinterestedness. At all times, the Examiner was supposed to be a neutral party in the case; he was not. He was supposed to be held to a higher standard of conduct and to disclose any matters relating to his compensation and any conflicts; he did not. He was a litigant in the case. Under these circumstances, the only effective solution is to deny the Examiner, and his law firm, all compensation.

Had the bankruptcy judge initially assigned to the case and the bankruptcy judge to whom the fee matter was later assigned fully understood and appreciated the seriousness of the situation put by the government and Big Rivers when the issue of the Examiner's conduct and his compensation first arose, a good deal of time, expense, and embarrassment could have been avoided.

SO ORDERED.

## LIST OF EXHIBITS

| | | DATE |
|---|---|---|
| Exhibit A | Affidavit of Examiner That He Is Disinterested | 10/18/96 |
| Exhibit B | Verified Statement of Appointee—Examiner | 10/18/96 |
| Exhibit C | Examiners First Interim Application for Allowance of Compensation and Reimbursement of Expenses<br>* excerpted | 3/26/97 |
| Exhibit D | Request for Payment of Administrative Expense and Proof of Claim | 6/5/97 |
| Exhibit E | Examiner's Second Application for Allowance of Compensation and Reimbursement of Expenses<br>* excerpted | 7/24/97 |

Exhibit F Examiner's Preliminary Pleading Regarding Application for 7/31/97
 Allowance of Compensation and Reimbursement of Expenses
 * excerpted

Exhibit G Examiner's Third Interim Application for Allowance of 1/2/98
 Compensation and Reimbursement of Expenses
 * excerpted

Exhibit H Final Application of J. Baxter Schilling, as Examiner, for 10/13/98
 Allowance of Compensation for Services Rendered and
 Reimbursement of Expenses Incurred for the Period
 * excerpted

Exhibit A

No. 96–41168(2).

### AFFIDAVIT OF EXAMINER THAT HE IS DISINTERESTED

\* \* \* \* \* \*

J. Baxter Schilling, being duly sworn deposes and says:

By order of this court dated October 18, 1996 affiant was duly appointed examiner in the above entitled case under chapter 11 of title 11, United States Code.

Affiant is a disinterested person in this case; that affiant is not a creditor, an equity security holder, or an insider; that affiant is not and was not an investment banker for any outstanding security of the debtor; that affiant has not been, within three years before the date of the filing of the petition herein, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with the offer, sale, or issuance of a security of the debtor; that affiant is not and was not, within two years before the date of the filing of the petition herein, a director, officer, or employee of the debtor or of an investment banker hereinabove specified; and that affiant does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, or connection with, or interest in, the debtor or an investment banker specified hereinabove, or for any other reason.

J. Baxter Schilling

COMMONWEALTH OF KENTUCKY)

)SS:

COUNTY OF JEFFERSON )

The undersigned Notary Public within and for the Commonwealth and County aforesaid does hereby certify that the foregoing instrument of writing was produced before me in said Commonwealth and County by J. Baxter Schilling, Examiner.

WITNESS my hand this 18th day of October 1996.

/s/

Notary Public, ~~Jefferson County~~State at Large, KY

My Commission Expires: 2–13–00

Exhibit B

### VERIFIED STATEMENT OF APPOINTEE— EXAMINER

\* \* \* \* \* \*

I, J. Baxter Schilling, duly appointed examiner in the above-entitled estate, hereby declare that I have no connections with the above-named debtor, creditors, or any other interested parties herein, their respective attorneys and accountants, the United States Trustee who appointed me to serve as examiner, or any person employed in the office of said United States

Trustee, except that I currently serve as a chapter 7 panel trustee in the Western District of Kentucky and have met and conferred with the United States Trustee and members of said United States Trustee's staff concerning other cases in which declarant was appointed trustee.

Dated: October 18, 1996

J. Baxter Schilling

## DECLARATION

I, J. Baxter Schilling, declare under penalty of perjury that the foregoing is true and correct.

Dated: October 18, 1996

J. Baxter Schilling

### Exhibit C

### EXAMINER'S FIRST INTERIM AP-PLICATION FOR ALLOWANCE OF COMPENSATION AND REIM-BURSEMENT OF EXPENSES

Comes the Examiner, pursuant to Section 105(a) and 331 of the United States Bankruptcy Code, and this Court's Order entered on or about November 15, 1996 establishing a procedure for interim compensation and reimbursement of expenses for the Examiner, and moves the Court to approve the Examiner's First Interim Application For Allowance of Compensation and Reimbursement of Expenses (First Application) in the sum of $181,998.00 for fees and $6,467.00 in reimbursement of expenses for the period from October 18, 1996 through March 20, 1997.

In support of this First Application, the Examiner states as follows.

#### Description of Work

Attached hereto, and incorporated herein by reference, are five edited statements relating to the Examiner's services and expenses, which relate to the period from October 18, 1996 through March 20, 1997.

(See Exhibits A–E). These billings for services performed by the Examiner are two areas constitute the subject areas in which the Examiner has concentrated his efforts, the Examiner has broken down his services into the various areas of work, as set forth on the attachments hereto.

#### Rule 2016(a) Disclosure

Pursuant to Rule 2016(a) the Examiner also states:

(1) Payments heretofore made to him, as identified above, as Examiner, total $136,469.50 in fees and $4,846.12 in expenses prior to his last billing (and $45,528.50 in fees and $1,620.88 in expenses are scheduled to be paid on or about April 1, 1997).

(2) The source of such payments was, to the best of the Examiner's knowledge, the cash collateral of the debtor.

(3) No previous compensation for the Examiner's services has been shared, and no agreement or understanding exists between the Examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(4) This is an interim fee application.

#### Disinterested Person

The Examiner is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed.

### Exhibit D

### REQUEST FOR PAYMENT OF AN ADMINISTRATIVE EXPENSE

Pursuant to the Bar Notice entered May 13 1997, the Examiner has calculated the maximum amount that he may seek to have the Court award to him upon proper notice and motion when costs of adminis-

tration are determined under the terms of the debtor's plan of reorganization.

The Examiner believes that prior to his appointment no new value was brought into the debtor's estate in excess of the originally filed PKEC Transaction, and it was the position of the debtor that the then-stated PKEC Transaction was the maximum amount that could be realized for the benefit of the creditors of the estate. The Examiner believed that new value could be brought into the estate for the benefit of the creditors, and discussed with various parties that he would seek a fee, not to exceed 3% of the new value brought into the estate, if such new value was brought in to the estate.

The Examiner has calculated the total new value brought into the estate since the date of his appointment is approximately 147 million dollars. This increased value has allowed the debtor to propose a confirmable plan, not subject to cram-down, for all respective classes of creditors will either be unimpaired or, if impaired, will vote in favor of the plan of reorganization. The Examiner has not determined the exact amount for which he will seek compensation in this case, however, for purposes of the Bar Notice, and the Request For Payment, he informs the debtor that the claim will not exceed $4.41 million.

J. BAXTER SCHILLING
1513 S. 4th St.
Louisville, KY 40208
(502)636–2103
Examiner

**606**

B10 (Official Form...) (Rev. 12/93)

| United States Bankruptcy Court Western District of Kentucky | PROOF OF CLAIM |
|---|---|

| In re (Name of Debtor) **Big Rivers Electric Corporation** | Case Number **96-41168** |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor
(The person or other entity to whom the debtor owes money or property)
**J. Baxter Schilling**
Name and Address Where Notices Should Be Sent

**1513 South Fourth St.**
**Louisville, KY 40208**

Telephone No. **(502) 636-2031**

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:

Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated _____

**1. BASIS FOR CLAIM**
☐ Goods sold
☒ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☐ Other (Describe briefly)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (Fill out below)
Your social security number _____
Unpaid compensation for services performed
from _____ to _____
(date) (date)

**2. DATE DEBT WAS INCURRED**
During pendency of Chapter 11 proceeding

**3. IF COURT JUDGMENT, DATE OBTAINED:**

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM $ _____
Attach evidence of perfection of security interest.
Brief Description of Collateral:
☐ Real Estate ☐ Motor Vehicle ☐ Other (Describe briefly)
Amount of arrearage and other charges at time case filed included in secured claim above, if any $ _____

☐ UNSECURED NONPRIORITY CLAIM $ _____
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $ _____
Specify the priority of the claim.
☐ Wages, salaries, or commissions (up to $2000), earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)
☐ Contributions to an employee benefit plan—11 U.S.C. § 507(a)(4)
☐ Up to $900 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use—11 U.S.C. § 507(a)(6)
☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(7)
☐ Other—Specify applicable paragraph of 11 U.S.C. § 507(a)

**5. TOTAL AMOUNT OF CLAIM AT TIME CASE FILED:** $ _____ (Unsecured) $ _____ (Secured) $ _____ (Priority) Not to exceed $4.41 Million (Ch. 11 Admin. Priority)

Not to exceed $4.41

☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

**6. CREDITS AND SETOFFS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

**7. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**8. TIME-STAMPED COPY:** To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

Date **6/3/97**

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) _____ , Examiner

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

**DEPOSITION EXHIBIT**
**BR 41**

Exhibit E 0418

*EXAMINER'S SECOND INTERIM APPLICATION FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES*

Comes the Examiner, pursuant to Sec-

tion 105(a) and 331 of the United States Bankruptcy Code, and this Court's Order entered on or about November 15, 1996 establishing a procedure for interim compensation and reimbursement of expenses for the Examiner, and moves the Court to approve the Examiner's Second Interim Application For Allowance of Compensation and Reimbursement of Expenses (Second Application) in the sum of $109,011.25 for fees and $2,317.23 in reimbursement of expenses for the period from March 21, 1997 through July 20, 1997.

In support of this Second Application, the Examiner states as follows.

### Description of Work

Attached hereto, and incorporated herein by reference, are four edited statements relating to the Examiner's services and expenses, which relate to the period from March 21, 1997 through July 20, 1997. (See Exhibits A–D). These billings for services performed by the Examiner are set forth in project categories as required under the U.S. Trustee guidelines. The fee statements attached hereto have been edited pursuant to this Court's Order entered on or about November 15, 1996. An unedited copy of each statement has been presented, under seal,

All hourly rate fees are consistent with the Examiner's hourly rate charged for the specified time period; however, pursuant to this Court's prior order, that hourly rate has been reduced by 50% for travel time if the Examiner was not performing services related to this case during the travel time.

### Summary of Work

The Examiner's work in this case has been primarily in two areas: (1) Investigation of allegations of mismanagement, breaches of fiduciary duties, fraud and potential causes of action held by the debtor; and, (2) Settlement negotiations with the various parties. While these two areas constitute the subject areas in which the Examiner has concentrated his efforts, the Examiner has broken down his services into the various areas of work, as set forth on the attachments hereto.

### Rule 2016(a) Disclosure

Pursuant to Rule 2016(a) the Examiner also states:

(1) Payments heretofore made to him, as identified in the Examiner's First Interim Application For Allowance of Compensation and Reimbursement of Expenses.

(2) Payments heretofore made to him, or scheduled to be made to him, as identified above during the Second Application period, which fees total $109,011.25 and reimbursement of expenses total $2,317.23.

(3) The source of such payments was, to the best of the Examiner's knowledge, the cash collateral of the debtor.

(4) No previous compensation for the Examiner's services has been shared, and no agreement or understanding exists between the Examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(5) This is an interim fee application.

### Disinterested Person

The Examiner is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed.

### Professional Biography

The Examiner holds a B.A. degree from the University of Kentucky, having graduated with high honors, in 1972. In 1975 the Examiner graduated from the University of Virginia School of Law. The Examiner has been a member of the Louisville, Kentucky and/or American Bar Associa-

tions since 1975. The Examiner has lectured to various bar associations or business groups relating to various bankruptcy and non-bankruptcy topics. The Examiner has been a panel trustee for this Court since 1979.

**WHEREFORE**, the Examiner moves that this Second Application be approved.

An Order is tendered herewith.

J. BAXTER SCHILLING
1513 S. 4th St.
Louisville, KY 40208
Examiner
(502)636–2103

Exhibit F

### EXAMINER'S PRELIMINARY PLEADING REGARDING APPLICATION FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES

### I. INTRODUCTION

The Court, in orally ordering the Examiner to file this preliminary pleading relating to his Application for Allowance of Compensation and Reimbursement of Expenses, stated that he did not, at this stage, want the parties to engage in discovery. As a result of that oral order, certain of the statements contained herein are based on discussions which the Examiner has had with representatives of various parties or entities involved in this case. If discovery is conducted, it is believed that the Examiner's statements contained herein will be supported by sworn testimony.

In this pleading the Examiner has also cited testimony or statements made in open court. These citations demonstrate the conflict which has existed in this case

between Big Rivers Electric Corporation (herein Big Rivers or the debtor), its consultants and attorneys (and in certain instances the Rural Utilities Service [herein RUS] ) relating to whether increased value could be brought into this estate and, if so, the method by which it could be derived. producing its original plan under its resolution process, or in comparing the cost that an investment banker would have charged for producing approximately $142 million of new value for the estate, it is believed that the fee sought by the Examiner is less than the cost of comparable services in a non-bankruptcy setting.

### III. NEGOTIATIONS RELATING TO EXAMINER'S FEES

As previously stated in pleadings, and as disclosed to the Court during the October 31—November 1 conference in Washington, the Examiner discussed with the Banks, MAPCO and RUS the Examiner's belief that he should be compensated for new value brought into the estate on a percentage basis (up to 3%).[14] The Banks and MAPCO agreed with that percentage approach, while the RUS stated, at that time, it would not agree or disagree with a percentage compensation to the Examiner.

The Court instructed the parties on July 1, 1997 to attempt to negotiate the Examiner's fee request. As a result of that directive, the Examiner has begun additional negotiations. As of the date of filing this pleading, those negotiations have been concluded only with Chase. (See a copy of agreement attached hereto.)

### IV. REQUESTED FEE AND EXPENSES

Based on total new value of not less than $141,600,000.00 brought into this estate af-

---

**14.** Albeit the Examiner is not basing his request for compensation under 11 U.S.C. § 326, a 3% fee is consistent with that section of the Code.

ter his appointment as Examiner, the Examiner requests total compensation in this case of $4,248,000.00. The Examiner has heretofore received (or is scheduled to receive) compensation of $291,009.25 based on his hourly-rate for services rendered from petition fees and its pre-petition "resolution process" professionals fees are combined, then the requested compensation of the Examiner is less than one-third of the total fees which the debtor believes is reasonable compensation to pay to its own professionals.

Finally, had the Examiner not taken the actions that he did in this case, no new value would have been added to the estate by the debtor. As Mr. Joseph Golden stated early in this case: "The best image that Big Rivers could put on would be to pay its bills." (Trans., 10/2/96, at 79). One reason the Examiner was able to convince creditors of this estate to form a consensual plan was because Big River paid its bills under the plan confirmed by the Court. The debtor's ability to pay its bills stemmed from the approximate $142 million in new value brought to this estate through the efforts of the Examiner. In addition, because this $142 million of new value was brought into the estate, the estate has saved an estimated $20 million in professional fees and expenses because of the rapidity in which this case was concluded in bankruptcy court.

For all the reasons contained herein, the Examiner believes that reasonable compensation for his services in this case is $4,248,000.00, with credits to be given for all hourly rate payments made to the Examiner prior to the Effective Date of the plan and his discharge from any further duties as Examiner. Also, all expenses incurred by the Examiner through the Effective Date of the plan should also be approved.

J. BAXTER SCHILLING
1513 South Fourth Street
Louisville, KY 40208
(502)636–2031
Examiner

The Chase Manhattan Bank
270 Park Avenue, 30th Floor
New York, NY 10017-2070
Tel 212-270-1484
Fax 212-270-5748

Patrick A. Daniello
Vice President
Exposure Recovery Group

July 31, 1997

J. Baxter Schilling, Esq.
1513 South Fourth Street
Louisville, KY 40404

RE: BIG RIVERS ELECTRIC CORPORATION

Dear Baxter:

I am writing to confirm the position of The Chase Manhattan Bank concerning your application for a $4,248,000 "success fee" under Sections 105, 330, 503(b) and any other applicable section of the Bankruptcy Code in the Big Rivers chapter 11 case.

It is my understanding that:

1. You will apply for the Bankruptcy Court to approve this amount to be paid by Big Rivers from all sources available to it, including (if necessary) cash collateral, but in any event including the following sources of payment which are not cash collateral or which the RUS has released from its lien:

 a. the Chase Effective Date Payment;

 b. the BNY Effective Date Payment;

 c. the $8,000,000 cash reserve the Debtor proposes to retain;

 d. the portion of the arbitrage profits which Big Rivers has been allowed by the RUS to retain; and

 e. any fees disgorged by the Debtor's professionals.

2. You will prosecute diligently your application to be paid by Big Rivers (including, but not limited to, being paid from cash collateral) and will similarly defend any appeals which may be taken of any award of compensation to you by the Bankruptcy Court.

3. Your "success fee" will only be payable if Big Rivers consummates the plan of reorganization which the Bankruptcy Court confirmed last month.

4. The actual amount of your "success fee" will be awarded by the Bankruptcy Court.

Based on foregoing, I am pleased to advise you that

A. Chase will support your application.

B. In the event the Bankruptcy Court awards you a "success fee" but for some reason requires the Debtor's creditors, and not the Debtor, to pay it, Chase will pay you its *pro rata* share (subject to the cap in paragraph C below) of the success fee, determined as follows:

$$\frac{83.3}{142.1} \text{ times} \quad \frac{\text{Postpetition Enhancement}}{\text{of Banks' Recovery}} \quad \text{times} \quad \text{Amount of success fee awarded you}$$

Postpetition Enhancement of Value

In the foregoing formula,

I. the "Postpetition Enhancement of Banks' Recovery: is stipulated to be $61,600,000.

II. "Postpetition Enhancement of Value is understood to be $141,600,000 consisting of the sum of the "Postpetition Enhancement of Banks' Recovery" plus the postpetition enhancement in the RUS' position which is stipulated for purposes hereof to be $60,000,000, plus the $6,000,000 to be paid to MAPCO, plus the increase in value of Green River Coal's recovery, which is stipulated to be $4,000,000, plus $10,000,000 in net present value of projected arbitrage proceeds to be retained by Big Rivers, free and clear of the RUS's liens.

C. In consideration of Chase's agreeing to this contingent payment, and to support your application, you agree that Chase's payment, if any, shall not exceed $835,335.00.

Sincerely yours,

*Patrick A. Daniello*

Patrick A. Daniello
Vice President

Exhibit G

## EXAMINER'S THIRD INTERIM APPLICATION FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES

Comes the Examiner, pursuant to Section 105(a) and 331 of the United States Bankruptcy Code, and this Court's Order entered on or about November 15, 1996 establishing a procedure for interim compensation and reimbursement of expenses for the Examiner, and moves the Court to approve the Examiner's Third Interim Application For Allowance of Compensation and Reimbursement of Expenses (Third Application) in the sum of $88,485.50 for fees and $1,750.72 in reimbursement of expenses for the period from July 21, 1997 through December 19, 1997.

In support of this Third Application, the Examiner states as follows.

### Description of Work

Attached hereto, and incorporated herein by reference, are five edited statements relating to the Examiner's services and expenses, which relate to the period from July 21, 1997 through December 19, 1997. (See Exhibits A–E). These billings for services performed by the Examiner are set forth in project categories as required under the U.S. Trustee guidelines. The fee statements attached hereto have been edited pursuant to this Court's Order entered on or about November 15, 1996. An unedited copy of each statement has been presented, under seal, to the Honorable J.

Wendell Roberts, U.S. Bankruptcy Judge. In the unedited copy of the billing through 12/19/97. ($15,022.00 for Non-travel hourly fee; $131.71 for Non-travel expenses).

All hourly rate fees are consistent with the Examiner's hourly rate charged for the specified time period; however, pursuant to this Court's prior order, that hourly rate has been reduced by 50% for travel time if the Examiner was not performing services related to this case during the travel time.

### Summary of Work

The Examiner's work in this case has been primarily in three areas: (1) Investigation of allegations of mismanagement, breaches of fiduciary duties, fraud and potential causes of action held by the debtor; (2) Settlement negotiations with the various parties, and (3) Litigation before the United States District Court for the Western District of Kentucky and this Court. While these three areas constitute the subject areas in which the Examiner has concentrated his efforts, the Examiner has broken down his services into the various areas of work, as set forth on the attachments hereto.

### Rule 2016(a) Disclosure

Pursuant to Rule 2016(a) the Examiner also states:

(1) Payments heretofore made to him, as identified in the Examiner's First and Second Interim Applications For Allowance of Compensation and Reimbursement of Expenses.

(2) Payments heretofore made to him, or scheduled to be made to him, as identified above during the Third Application period, which fees total $88,485.50 and reimbursement of expenses total $1,750.72.

(3) The source of such payments was, to the best of the Examiner's knowledge, the cash collateral of the debtor.

(4) No previous compensation for the Examiner's services has been shared, and no agreement or understanding exists between the Examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(5) The Examiner has attempted to settle with certain parties in this case his compensation. As a result of those settlement negotiations, the Examiner has agreed to certain matters relating to his fee as specified in a letter from Pat Daniello to the Examiner dated July 31, 1997, which letter has heretofore been disclosed to the court and those parties or entities involved in the Examiner's compensation.

(6) This is an interim fee application.

### Disinterested Person

The Examiner is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which the Examiner was appointed.

### Professional Biography

The Examiner holds a B.A. degree from the University of Kentucky, having graduated with high honors, in 1972. In 1975 the Examiner graduated from the University of Virginia School of Law. The Examiner has been a member of the Louisville, Kentucky and/or American Bar Associations since 1975. The Examiner has lectured to various bar associations or business groups relating to various bankruptcy and non-bankruptcy topics. The Examiner has

Exhibit H

**FINAL APPLICATION OF J. BAXTER SCHILLING, AS EXAMINER, FOR ALLOWANCE OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF EXPENSES INCURRED FOR THE PERIOD FROM OCTOBER 18, 1996 THROUGH OCTOBER 12, 1998**

Comes the Examiner, J. Baxter Schilling, and pursuant to this Court's Order entered October 2, 1998 files this final fee application for services rendered from the date of his appointment (October 18, 1996) through October 12, 1998.[1] The Examiner requests compensation for the services he has performed in the aforestated time period in the sum of $4.41 million, and reimbursement of expenses of $12,956.55. In further support of this application, the Examiner states:

### 1. Incorporated Pleadings

The Examiner incorporates herein, by reference, his pleadings entitled *Request For Payment Of An Administrative Expense* (herein *Examiner's Fee Request*), *Examiner's Preliminary Pleading Regarding Application For Allowance of Compensation And Allowance Of Expenses* (herein *Examiner's Preliminary Pleading*) and the *Examiner's Memorandum In Support Of His Final Fee Application For Period From October 18, 1996 Through October 12, 1998* (herein *Examiner's Memorandum*), in support of this final fee application.

### 2. Incorporated Interim Fee Applications

The Examiner incorporates herein, by reference, all four of the Interim Fee Applications

---

1. The Court, in his Order entered October 2, 1998, specifically authorized the continuation of the Examiner's services in specified areas

(B) Payments made to him for the period from October 18, 1996 through September 13, 1998 total as follows: Non-travel fees of $480,692.00; Travel fees of $3,287.75; Expenses of $12,027.74. As stated, the Examiner has one monthly billing outstanding (for the period from September 14, 1998 through October 12, 1998) and that billing represents Examiner's hourly rate fees of $46,949.00, no travel fees, and non-travel expenses of $928.81, which billing is included in this final fee application.

(C) The source of payment of the Examiner's fees and expenses, to the best of his knowledge, was either the cash collateral of the debtor or non-cash collateral funds available to the debtor to make the required payments.

(D) No previous compensation for the Examiner's services has been shared, and no agreement or understanding exists between the examiner and any other entity for the sharing of compensation received or to be received for the Examiner's services in, or in connection with, this case.

(E) At the direction of this Court the Examiner has attempted to settle with certain parties in this case his compensation. As a result of those settlement negotiations, the Examiner has agreed to certain matters relating to his fee as specified in a letter from Pat Daniello to the Examiner dated July 31, 1997, which letter has heretofore been disclosed to the Court and those parties or entities involved in the issue of the Examiner's compensation, and which letter was attached to the *Examiner's Preliminary Pleading*.

---

in this case; thus, this final fee application does not relate to such services as performed after October 12, 1998.

(F) This is a final fee application for services rendered as Examiner for the period October 18, 1996 through October 12, 1998.

### 9. Disinterested Person

J. Baxter Schilling is a "disinterested person" as defined in the Bankruptcy Code, and he does not represent or hold an interest adverse to the interests of the estate with respect to the matters about which he was appointed examiner in this case.