**KENTUCKY BAR ASSOCIATION, Movant,**

v.

**J. Baxter SCHILLING, Respondent.**

**No. 2011–SC–000657–KB.**

Supreme Court of Kentucky.

Feb. 23, 2012.

## OPINION AND ORDER

J. Baxter Schilling, KBA Member No. 61905, bar roster address 1513 S. 4th Street, Louisville, Kentucky 40208, was admitted to practice law in Kentucky in 1975. The Kentucky Bar Association's Board of Governors found Schilling guilty of five counts of professional misconduct in connection with his role as an examiner in the Big Rivers Electric Corporation bankruptcy proceeding in the late 1990s and recommended a public reprimand from this Court as the sanction. Upon careful review, we find that Schilling is guilty of four counts of professional misconduct; and we publicly reprimand Schilling for his professional misconduct.

## I. FACTS.

The bankruptcy court appointed Schilling in late 1996 to serve as the examiner in the Big Rivers Electric Corporation Chapter 11 Bankruptcy case ("the Big Rivers case"). The Big Rivers case was one of the largest, if not the largest, bankruptcy cases ever filed in Kentucky.[1] As examiner, Schilling's job was to help Big Rivers and its creditors arrive at a consensual plan of reorganization. The order designating Schilling as the examiner included a list of duties but did not address Schilling's compensation.

Schilling attended a settlement conference in Washington, D.C., to develop a consensual plan of reorganization for Big Rivers to submit to the court.[2] Schilling promoted an agreement between Rural Utility Service[3] (RUS) and three major unsecured creditors, Chase Bank (Chase), Bank of New York (BONY), and Mapco

---

1. Big Rivers Electric Corporation was unable to meet financial obligations on $1.2 billion debt.

2. This case came to Mr. Schilling as a "prepackaged" bankruptcy. But the terms of the original deal provided no payments to any unsecured creditors, so the case was extremely litigious and complicated.

3. RUS was the largest secured creditor.

Equities (Mapco). When RUS representatives were not present at the settlement conference, Schilling approached representatives of the unsecured creditors with a proposal that they pay him a percentage fee for any "new value" brought to the estate.[4] Initially, neither the unsecured creditors nor Schilling disclosed these communications to the bankruptcy trustee or any other parties.

Big Rivers filed its proposed reorganization plan a few months later.[5] At that time, Schilling allegedly requested and received approval from the bankruptcy court to negotiate a percentage-based fee with Chase, BONY, and Mapco. Schilling contends that the court approved his request. But the Sixth Circuit Court of Appeals later characterized the fee request as ex parte and found that the bankruptcy court had not approved Schilling's seeking a fee directly from the unsecured creditors.

Meanwhile, Schilling began to negotiate his percentage-based fee with Chase, BONY, and Mapco. He sent letters to each of them with calculations of the fee owed to him. Each letter referenced an oral agreement for a fee, to which no one had objected.[6] Over the ensuing weeks, it became apparent that the unsecured creditors would not give written consent to Schilling's fee arrangement. So Schilling abandoned his attempt to reach a consensual fee resolution. And, finally, he filed a fee application with the bankruptcy court.

When Schilling filed this fee application, he believed himself to be a "disinterested person,"[7] a status that the Bankruptcy Code required of him as a prerequisite to any entitlement to recover any fee. But

4. Allegedly, Schilling referred to this as a "success fee." He later refined the conversation by saying that he considered his duties as examiner similar to those of a trustee. And, consequently, he would seek a final fee award under 11 U.S.C. § 326, which permits a trustee to receive compensation not to exceed 3 percent on sums over $1,000,000.

5. Schilling played a large role in reaching a consensual resolution to the dispute. He initiated negotiations with other utility companies to purchase Big Rivers's assets, which resulted in an additional $63 million value.

6. At a hearing on November 13, 1996, several parties approached the trustee expressing concern over Schilling's statements that he would seek a percentage-based fee during the Washington settlement conference. So the trustee requested an in camera hearing to discuss the fee, but the court stated it would not conduct such a hearing. The court further instructed the participants that if anyone objected to Schilling's percentage-based fee, they should raise their objections in open court. No one objected. Schilling considered the parties' silence as consent to his percentage-based fee.

7. This is a legal concept unique to bankruptcy fee awards and defined by the Bankruptcy Code. 11 U.S.C. § 101(14). The definition in effect in 1996 stated:

"[D]isinterested person" means person that—
(A) is not a creditor, an equity security holder, or an insider;
(B) is not and was not an investment banker for any outstanding security of the debtor;
(C) has not been, within three years before the date of the filing of the petition, an investment banker in connection with the offer, sale, or issuance of a security of the debtor;
(D) is not and was not, within two years before the date of the filing of the petition a director, officer, or employee of the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph; and
(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason[.]

Schilling did not disclose the nature of the fee agreements he attempted to forge with Chase, BONY, or Mapco.[8]

The bankruptcy court ordered all parties to negotiate Schilling's percentage-based fee. As a result of the negotiations, Chase reached an agreement, which was memorialized in writing on July 31, 1997. But Schilling submitted his second fee application to the court on July 24, 1997, and, again, disclaimed any improper interest. Schilling filed his Preliminary Pleading regarding fees on July 31, 1997. In the Preliminary Pleading, Schilling stated that he disclosed that the three unsecured creditors agreed to' a percentage-based fee agreement at the Washington, D.C., settlement conference and attached Chase's written agreement to a percentage-based fee.[9]

After Schilling disclosed the agreement with Chase, RUS and the trustee demanded discovery regarding the fee arrangement. And the trustee requested disgorgement of all fees received by Schilling and his firm. Although no discovery was permitted, the parties were allowed to submit written argument on the issue of Schilling's fee when the court revisited the issue in September 1998. At this time,

Schilling claimed he never made a side agreement with Mapco. But Mapco produced letters that Schilling sent to the company insisting they reached such a fee agreement. BONY also submitted a similar letter from Schilling.

Schilling submitted his final fee application nearly two years following his initial appointment. In the final request, he asked for fees totaling $4.41 million.[10] The trustee responded with a motion to compel Schilling to disgorge all fees based on his improper actions in negotiating secret, side agreements related to his compensation.

Judge Roberts, who presided over the case and precluded discovery on the fee issue, recused himself. And Judge David T. Stosberg was appointed. Judge Stosberg continued the discovery ban and issued a ruling on Schilling's fee application without an evidentiary hearing. Judge Stosberg awarded Schilling a fee of $2,638,205, to be paid by Big Rivers.[11] Big Rivers, RUS, the trustee, and Schilling all appealed to the federal district court.

The federal district court affirmed the order regarding Schilling's base compensation but reversed the part of the order that allowed enhancement. Because the bank-

---

**8.** Federal Rules of Bankruptcy Procedure, Rule 2016 requires that:

> application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or
>
> agreement or understanding therefor, except that details of any agreement by the

applicant for the sharing of compensation as a member or regular associate of a firm of lawyers or accountants shall not be required.

**9.** The Sixth Circuit found this was "the first public disclosure of Schilling's intention and efforts to have his percentage-based compensation paid by these three creditors as opposed to the estate." *In re Big Rivers Elec. Corp.*, 355 F.3d 415, 426 (6th Cir.2004).

**10.** Interim compensation had been in the amount of $530,928.75, which left $3,879,071.25 in requested, unpaid fees.

**11.** This amount reflected Schilling's hourly rate and an enhancement of four times his hourly rate.

ruptcy court did not address the issue of disgorgement, the matter was remanded for the bankruptcy court to consider it. On remand, RUS stated its intention to take Judge Roberts's deposition. Consequently, all bankruptcy and federal district court judges in the Western District of Kentucky recused themselves. And Judge Cohn from the Eastern District of Michigan was assigned the case.

Judge Cohn allowed discovery and, after hearing evidence, ordered the disgorgement of Schilling's entire fee. Judge Cohn's opinion concluded that Schilling was not entitled to any fees because he was not "disinterested" as of the moment he suggested to the three unsecured creditors that they pay him a percentage-based "success" fee.[12] And Judge Cohn found that Schilling's lack of "disinterestedness" resulted in an inability to act as a neutral third party.[13] Finally, Judge Cohn found that Schilling hid his self-interest from the trustee.[14]

The United States Court of Appeals for the Sixth Circuit affirmed Judge Cohn's findings and found that:

1) Schilling violated his duty to remain disinterested;[15]
2) He violated his disclosure obligations each time he filed a fee application;[16] and
3) He violated his duty of loyalty by entering into the oral agreement with Chase and misrepresenting his ac-

tions to the court and to the parties during his negotiations with the parties and his efforts to backtrack from them.[17]

The Court of Appeals generally characterized Schilling's actions as secretive and deceptive[18] and found that disgorgement of all fees was the appropriate sanction.[19]

## II. PROCEDURAL HISTORY OF THE PROFESSIONAL MISCONDUCT CHARGE.

Following final disposition in the federal courts, the Inquiry Commission issued a five-count Charge against Schilling for violations of SCR 3.130–1.5(a) (charging an unreasonable fee); SCR 3.130–3.3(a) (making false statements of material fact or law to a tribunal); SCR 3.130–3.4(c) (knowingly disobeying an obligation under the rules of a tribunal); SCR 3.130–4.1 (knowingly disobeying an obligation under the rules of a tribunal); and SCR 3.130–8.3(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).[20] The Inquiry Commission concluded that the opinion of the Sixth Circuit Court of Appeals sufficiently established probable cause to believe that Schilling violated those disciplinary rules.

The Trial Commissioner was appointed to hear the charges. After protracted prehearing proceedings, the evidentiary hearing for KBA File 9791 was held nearly

---

12. *In re Big Rivers Elec. Corp.*, 355 F.3d at 428.

13. *Id.*

14. *Id.*

15. *Id.* at 434.

16. *Id.* at 435.

17. *Id.*

18. *Id.* at 438.

19. *Id.* at 443–44.

20. Although the disciplinary hearing took place in 2010, the acts that gave rise to this matter and the Inquiry Commission's issuance of charges took place before the July 2009 amendments to the Kentucky Rules of Professional Conduct went into effect. As such, we apply the Kentucky Rules of Professional Conduct in effect before July 2009.

four years later. The KBA's cases consisted of exhibits and testimony from Schilling and the bankruptcy trustee. Schilling was represented by an attorney at the hearing and presented his own testimony, the testimony of Judge Stosberg, and submitted various trial exhibits.

The Trial Commissioner's report recommended that all counts in the Charge against Schilling be dismissed. Under SCR 3.365, the KBA appealed the Trial Commissioner's recommendation to the Board of Governors (Board).

The Board reviewed the case de novo.[21] After briefing from both sides, the Board heard oral arguments in September 2011. Ultimately, the Board found Schilling guilty on all counts and recommended a public reprimand as the appropriate sanction.[22] This review followed upon Schilling's notice of appeal and briefing by both parties.

## III. ANALYSIS.

On review in this Court, Schilling contends that the Board rejected the Trial Commissioner's analysis and recommended a public reprimand based on an improper application of the doctrine of collateral estoppel. The KBA responds that the decision of the Board was well reasoned and supported by the law and facts.

Under SCR 3.370,[23] we review the decisions of the Trial Commissioner and the Board. "The findings of fact by the trial commissioners and the Board of Governors are advisory only.... [The Court] make[s] an independent review of the record and findings of fact."[24] And we conclude that the decision from the Sixth Circuit Court of Appeals conclusively established that Schilling engaged in certain activities that violate our rules.

The doctrine of collateral estoppel has been applied in a variety of contexts in the Commonwealth, including attorney disciplinary matters.[25] "In disciplinary proceedings, a judgment of a court is considered conclusive proof that the alleged conduct occurred."[26] And although the Trial Commissioner did not analyze the applicability of the doctrine of collateral estoppel, he concluded it was inappropriate to decide the issues by simply reading the federal appellate court's opinion. So he largely disregarded the opinions of the federal court and relied on the "essentially unrebutted evidence presented by Mr. Schilling at the hearing on this matter."[27] The Trial Commissioner placed strong reliance on "interlocutory opinions of the Bankruptcy Judges[,] which were reversed on appeal."[28] And the Trial Commission-

21. The Board voted 15 in favor and 2 opposed to conducting de novo review of this matter.

22. On Count I, the Board voted 13 guilty and 4 not guilty. On Count II, the Board voted 15 guilty and 2 not guilty. Counts III, IV, and V were unanimous guilty votes.

23. By 2011, Kentucky Court Order 0008, effective November 15, 2011, SCR 3.370 was amended. Because the decisions of the Trial Commissioner and the Board were made before that date, we apply the SCR 3.370 before its amendment.

24. *KBA v. Berry*, 626 S.W.2d 632, 633 (Ky. 1981).

25. *KBA v. Horn*, 4 S.W.3d 135 (Ky.1999); *KBA v. Harris*, 269 S.W.3d 414 (Ky.2008); *Atherton v. KBA*, 308 S.W.3d 197 (Ky.2010); *KBA v. Rowsey*, 334 S.W.3d 105 (Ky.2011).

26. *Harris*, 269 S.W.3d at 418 (citation omitted).

27. Trial Commissioner's Findings of Fact, Conclusion of Law, and Recommendation, p. 14.

28. Findings of Fact, Conclusions of Law, and Recommendations of the Board of Governors, p. 9.

er found that the criticisms of Schilling in Judge Cohn's opinion and the Sixth Circuit's opinion did not rise to the level of violations of the Kentucky code of professional conduct.[29]

■ Although Schilling asserts the Board arbitrarily applied the doctrine of collateral estoppel, we observe that the Board's Findings of Fact, Conclusions of Law, and Recommendations recognized the elements of collateral estoppel. The elements of collateral estoppel are: (1) the issues in the second case are the same as the first and (2) the issues were actually litigated, (3) actually decided, and (4) necessary.[30] First, the Sixth Circuit decision addressed issues about Schilling's fee, statements to the court and third parties, failure to comply with the Bankruptcy Code, and dishonest behavior. Each of these findings was litigated and essential to the Sixth Circuit's determination that he was not a "disinterested" person and that he violated his duties as an examiner. Finally, the Sixth Circuit decision is undoubtedly a final decision on the merits; and by virtue of the requirement that he disgorge all fees associated with the case, Schilling was the losing party. So we cannot disregard the opinions of the federal courts in this matter.

The Bankruptcy Code requires two duties of examiners,[31] which are typically associated with trustees. Examiners are required to investigate "the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan."[32] And examiners must file a report identifying and memorializing "any fact ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate."[33] Other mandatory duties may also be assigned to the examiner by the court.[34] "Given the sensitivity of these tasks and the objectivity required to perform them, the [Bankruptcy] Code requires all examiners, like Chapter 11 trustees, to be 'disinterested.'"[35] Although trustees and examiners are similar in ways, "the Code now prohibits an examiner from serving as a trustee or as counsel for the trustee in order to ensure that examiners may not profit from the results of their work."[36]

But that does not mean that examiners are expected to donate their time. Examiners may "request reasonable compensation for actual, necessary services" and "reimbursement for actual, necessary expenses."[37] The Bankruptcy Code also authorizes interim fees.[38] But no fees will be awarded until "[a]fter notice to the parties

---

29. Trial Commissioner's Findings of Fact, Conclusion of Law, and Recommendation, p. 13.

30. *Coomer v. CSX Transp., Inc.*, 319 S.W.3d 366, 374 (Ky.2010).

31. The Bankruptcy Code also incorporates the traditional equitable duties to examiners and trustees. *See Young v. United States*, 535 U.S. 43, 52, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002).

32. 11 U.S.C. § 1106(a)(3).

33. *Id.* § 1106(a)(4)(A).

34. *Id.* § 1106(b).

35. *In re Big Rivers Elec. Corp.*, 355 F.3d at 429 (*citing* 11 U.S.C. § 1104(d)).

36. *Id.* at 430.

37. 11 U.S.C. § 330(a)(1).

38. *Id.* § 331.

in interest and the United States Trustee and a hearing." [39]

In its holding, the Sixth Circuit Court of Appeals explained that the duties of an examiner "flow from the [Bankruptcy] Code, the Federal Rules of Bankruptcy Procedure, and the common law." [40] And the Court of Appeals explained that those sources of law create three primary obligations for examiners:

1) "[C]onsistent with the statutory requirement of 'disinterest,' the examiner may not have a 'material adverse' interest to any party to the bankruptcy 'for any ... reason' either at the time of appointment or during the course of the bankruptcy[;]" [41]

2) In accord with the Federal Rules of Bankruptcy Procedure, examiners must make several disclosures including "payments ... made or promised" to them, including all fee applications and any agreements they understand to have been reached with anyone regarding compensation; [42] and

3) "[C]onsistent with the statutory requirement for receiving 'reasonable compensation' and with the common-law standards of fiduciary duty, examiners owe the creditors and shareholders a duty of loyalty." [43]

On review, the Court of Appeals considered the relevant legal authority and professional duties for Schilling as examiner and found that he failed to live up to the established standards.

First, the Sixth Circuit opinion found that Schilling "violated his duty to remain 'disinterested.'" [44] The violation of the duty to remain disinterested stems from Schilling's attempt to arrange compensation with the unsecured creditors, particularly the agreement with Chase. "Given the zero-sum realities of most bankruptcies, every dollar recovered by a favored creditor becomes a dollar lost to a disfavored creditor. Opportunities abound ... for bankruptcy examiners paid in this manner to benefit selected patrons." [45]

Second, the Sixth Circuit found that Schilling violated his duty of disclosure. [46] Each time Schilling filed interim applications for fees, he violated Rule 2016(a), which required him to disclose any payments made, promised, or believed to be made or promised. [47] Letters written by Schilling and sent to the three unsecured creditors indicated his belief that he had struck a percentage-based fee agreement with the unsecured creditors. As aptly noted by the Court of Appeals, "When a court-appointed fiduciary believes a party has promised him payment, he may not use later disputes over the existence or enforceability of the promise to excuse an earlier failure to disclose it." [48]

And third, "Schilling violated his duty of loyalty—not just by entering into the oral agreement with Chase, but by misrepresenting his actions to the court and to the parties during the negotiations with the

---

39. *Id.* § 330(a)(1)(A) & (B).

40. *In re Big Rivers Elec. Corp.,* 355 F.3d at 433.

41. *Id.* (citations omitted).

42. *Id.* at 433–44 (citations omitted).

43. *Id.* at 434.

44. *Id.*

45. *Id.*

46. *Id.* at 435.

47. *Id.*

48. *Id.*

parties and during his efforts to backtrack from them." [49] Schilling repeatedly violated his duty of loyalty and candor to the court when he filed multiple documents with the court stating he had no adverse interests. And Schilling violated these duties when he did not report he received a promise to receive payment from the unsecured creditors [50] and stated to the court directly that he. never made a side agreement with Mapco.

In finding these violations occurred, the Court of Appeals affirmed the lower federal courts' decisions to sanction Schilling by requiring him to disgorge all of the fees he and his firm received as a result of his role as examiner. [51]

■ Count II of the Charge alleges that Schilling made a false statement of material fact or law to the tribunal, failed to disclose material facts to the. tribunal to avoid fraud, and offered evidence the lawyer knew to be false. Judge Cohn's initial fact-finding established that Schilling did not disclose his fee solicitation and agreement with Chase and alleged agreements with BONY and Mapco, although he repeatedly filed affidavits alleging disinterestedness. The Sixth Circuit made a legal finding that Schilling violated his duty to remain disinterested when he attempted to negotiate a percentage-based fee arrangement with the unsecured creditors. Consequently, each time he submitted a fee request, he misrepresented a material fact to the court and other parties. So we conclude he is guilty of Count II (violating SCR 3.130–3.3(a).).

■ Because Schilling was obligated by 11 U.S.C. § 329 and Bankruptcy Rule of Procedure 2016 to disclose any fee arrangements, we find that his failure to disclose his fee arrangements, as outlined in Count II, supports a finding of guilt in Count III (violating SCR 3.130–3.4(c)).

■ When Schilling sent letters to the three unsecured creditors, he insisted that each creditor reached a percentage-based fee agreement. But at a later hearing, Schilling stated that he never made a side agreement with Mapco. Mapco later filed Schilling's letter claiming an agreement existed to dispute his statement. Although Schilling contends these contradictory positions are permissible as a negotiation tactic, the Sixth Circuit found that "the law does not allow a court-appointed fiduciary to engage in secret and self-interested negotiations so long as the parties stop short of a formal agreement ... because the risks of partiality" are unquestionably severe. [52] We agree with the Sixth Circuit and find that this breach of fiduciary duty included Schilling knowingly making false statements of material fact to the three unsecured creditors. So we find Schilling guilty of Count IV (violating SCR 3.130–4.1).

■ The federal district court made several findings to support a conclusion that Schilling actively misrepresented himself and made misleading statements: Schilling "affirmatively misled the government and others by filing certifications that he was a 'disinterested person' " [53] and misrepresented his attempts to negotiate percentage-based fee agreements with the

49. *Id.*

50. As previously stated, this violates the duties of an examiner because he must report any payment or agreement to be paid that he *believes* exists.

51. 355 F.3d at 436–37.

52. *In re Big Rivers Elec. Corp.,* 355 F.3d at 438.

53. *In re Big Rivers Elec. Corp.,* 284 B.R. 580, 597 (W.D.Ky.2002).

unsecured creditors (including denying a side agreement with Mapco and asserting to all creditors that they reached a fee agreement).[54] The behaviors described above are sufficient to conclude that Schilling is guilty of Count V (violating SCR 3.130–8.3(c)).

■ Finally, the KBA also asks that we find Schilling guilty of violating SCR 3.130–1.5(a) for charging an unreasonable fee. The Board found that Schilling's lack of disinterestedness precluded his request for and recovery of any fee. Of course, the Board benefitted from hindsight in this circumstance relying on the conclusions of federal district court Judge Cohn and the opinion of the Sixth Circuit Court of Appeals. When Schilling made his fee request, there was no accusation or determination that he was disinterested.

During the course of the litigation, the bankruptcy judges effusively praised Schilling's work as examiner. In a memorandum, issued November 5, 1997, Judge Roberts said Schilling's "Herculean efforts are reminiscent of Dr. Henry Kissinger's 'shuttle diplomacy' and the results achieved are nearly as breathtaking and significant." Judge Roberts further stated that "many of the parties are arguing that any fee over and above the Examiner's

$185.00 hourly rate should be denied. . . . They should be jubilant about the results which lifted them from the cesspool of vehemently fought litigation and contentiousness." Undoubtedly, when Schilling filed his final application fee on October 13, 1998, he relied on the spirit of these comments when he requested an enhanced fee.

Schilling's application for fees contained a well-briefed argument addressing the reasons why he believed he was entitled to an enhancement beyond his base rate. And he addressed the criteria established under 11 U.S.C § 330(a)(3) [55] for determining the amount of reasonable compensation.[56] Schilling noted that he spent 2,878.10 hours on the case, increased the value of the estate by $147 million, and consensually resolved contentious litigation in a number of months.

And one other bankruptcy judge agreed with Schilling. When Judge Stosberg awarded Schilling a $2,110,564 fee, he noted that novel and difficult issues permeated the case because it was one of the largest bankruptcy cases in history; Schilling faced problems of mismanagement and fraud; and Schilling played a role in resolving over seventy lawsuits in several different forums.[57] Judge Stosberg ob-

---

**54.** *Id.* at 589 and 592–93.

**55.** (3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

  (A) the time spent on such services;

  (B) the rates charged for such services;

  (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

  (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and

nature of the problem, issue, or task addressed;

  (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

  (F) whether the compensation is reasonable based on the customary. compensation charged by comparably skilled practitioners in cases other than cases under this title.

**56.** However, we do note that many of Schilling's arguments cited similar cases that do not arise under Title 11.

**57.** *In re Big Rivers Elec. Corp.,* 233 B.R. 754, 763–64 (Bankr.W.D.Ky.1999).

served that Schilling's actions were so efficient he spared the estate the expense of hiring a team of accountants and a creditors' committee.[58] Judge Stosberg even stated, "Despite the enormous difficulties encountered, [Schilling] spurred success through extraordinary effort. From the Court's perspective and based on our rigorous, exhaustive and lengthy scrutiny of the entire record, the Examiner deserves enhanced compensation." [59]

On review, the district court concluded that the enhancement awarded by Judge Stosberg was an abuse of discretion.[60] The court stated, "The results obtained in this Chapter 11 bankruptcy were undoubtedly outstanding, however, this is not the 'rare' or 'exceptional' case that warrants a fee enhancement." [61] And as is discussed above, Schilling was eventually ordered to disgorge his entire fee.

■ After determining the reasonable amount for a fee, the bankruptcy court has discretion to adjust the fee upward or downward according to other considerations.[62] And fee enhancement is permissible in "rare" and "exceptional cases." [63] Although the court eventually concluded that Schilling's work was not so exceptional as to warrant an enhancement, he reasonably believed he accomplished the extraordinary by helping Big Rivers and its creditors reach a consensual resolution, a belief enforced by the hearty affirmations of bankruptcy Judges Roberts and Stosberg. Schilling requested an enormous fee, and perhaps he was negotiating this time with the bench. But in doing so, he complied with the procedural rules of the statute because no fee could be awarded without judicial approval following a hearing. So Schilling was technically unable to charge the estate. The examiner's fee could only be charged after a valid court order approved the amount of the fee. Unlike the instance in which an attorney sends a bill to a client, procedural safeguards were in place to control the awarding of the examiner's fee.

Because of the atmosphere surrounding these proceedings, including the fulsome praise from the bankruptcy bench and unprecedented resolution of the controversies, Schilling believed that his work was "rare" and "exceptional." He followed the proper procedural mechanisms to request a fee enhancement. And at least one judge was prepared to award him a portion of his requested enhancement. Schilling's professional misconduct relates to his actions when soliciting the unsecured creditors to pay his fee and not from simply requesting an enhanced fee.[64]

The federal court system sanctioned Schilling by compelling disgorgement of his entire fee as a sanction for violating several portions of the bankruptcy code. But those violations do not mean that his initial fee request was unethical or patently unreasonable based on the amount of time he devoted to the case's resolution,

---

58. *Id.* at 766.

59. *Id.* at 767–68.

60. *In re Big Rivers Elec. Corp.*, 252 B.R. 676 (Bankr.W.D.Ky.2000).

61. *Id.* at 687.

62. *Id.* at 686 (citation omitted).

63. *Id.*

64. "Although there is nothing in the Bankruptcy Code or Rule which prevent[s] the Examiner from requesting any type of fee, including an enhanced fee, and any such fee is ultimately determined by the bankruptcy court, this fact alone does not support the Examiner's actions in actively soliciting BONY, Chase and Mapco for payment of his compensation." *In re Big Rivers Elec. Corp.*, 284 B.R. 580, 601–02 (Bankr.W.D.Ky.2002).

the unquestionably successful outcome, and his prior experience. So even though he may not be entitled to recover any fee, Schilling's initial request was not professionally unreasonable. Consequently, we find Schilling not guilty of Count I of the Charge.

We find that the Board's recommendation of a public reprimand is appropriate.[65] Schilling does not have a prior disciplinary history. And we have imposed public reprimands as sanctions on other occasions.[66] The Board also recommended that Schilling pay the costs of the proceedings. Based upon the foregoing, the Court orders that:

1) J. Baxter Schilling is found guilty of Counts II, III, IV, and V of the Charge alleged in KBA File 9791;

2) Schilling is found not guilty of Count I alleged in KBA File 9791, and that Count is hereby dismissed, with prejudice;

3) Schilling is hereby publicly reprimanded for his unprofessional conduct in KBA File 9791; and

4) In accordance with SCR 3.450, Schilling is directed to pay all costs associated with these disciplinary proceedings against him, said sum being $9,952.86, for which execution may issue from this Court upon finality of this Opinion and Order.

All sitting. All concur.

ENTERED: February 23, 2012.

/s/ John D. Minton, Jr.
   Chief Justice

---

**65.** The Board voted 17–0 in favor of a public reprimand.

**66.** *KBA v. Geisler,* 938 S.W.2d 578 (Ky.1997); *Howes v. KBA,* 214 S.W.3d 319 (Ky.2007).